## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Nekima Levy Armstrong, Marques Armstrong,
Terry Hempfling, and Rachel Clark,
*On behalf of themselves and other similarly
situated individuals,*

        Plaintiffs,

    v.

City of Minneapolis, Minneapolis Chief of Police
Medaria Arradondo *in his individual and official
capacity*; Minneapolis Police Lieutenant Robert
Kroll, *in his individual and official capacity*;
Minnesota Department of Public Safety
Commissioner John Harrington, *in his individual
and official capacity*; Minnesota State Patrol
Colonel Matthew Langer, *in his individual and
official capacity*; and John Does 1-2, *in their
individual and official capacities,*

        Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**


**COMPLAINT**

---

For their Complaint, Plaintiffs state and allege as follows:

## **INTRODUCTION**

The right to assemble is fundamental, as is the right to speak out against injustice. These

rights are enshrined in our Constitution. Ideas and movements that changed the course of our

history came to the forefront of the American consciousness through assembly and protest. Law

enforcement too often has been on the wrong side of history, attempting to suppress the right of

the people to assemble. This freedom cannot be suppressed and it must be protected at all costs.

Minnesota is no exception. Historically, law enforcement in Minneapolis specifically, and

Minnesota more generally, have attempted to suppress the right of its citizens to assemble

peacefully. Recently, they have been and are actively suppressing this right by exercising

unnecessary and excessive force against protesters who gathered to express their outrage at the murder of George Floyd at the hands of the Minneapolis Police Department. This unnecessarily forceful treatment of protesters, at the expense of proper constitutional protections, casts a pall over future protests and cannot continue.

Plaintiffs bring this civil rights class action against the City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo, in his individual and official capacity; Minneapolis Police Lieutenant Robert Kroll, in his individual and official capacity; Minnesota Department of Public Safety Commissioner John Harrington, in his individual and official capacity; Minnesota State Patrol Colonel Matthew Langer, in his individual and official capacity; and John Does 1-2, in their individual and official capacities, for retaliating against persons engaging in First Amendment-protected activity; for applying excessive force; and for violating procedural due process rights by firing chemical irritants and other less-lethal munitions for the purpose of intimidation without a constitutionally-sufficient warning.

## PARTIES

1.      Plaintiff Nekima Levy Armstrong is a Minnesota resident who lives in the city of Minneapolis.

2.      Plaintiff Marques Armstrong is a Minnesota resident who lives in the city of Minneapolis.

3.      Plaintiff Terry Hempfling is a Minnesota resident who lives in the city of Minneapolis.

4.      Plaintiff Rachel Clark is a Minnesota resident who lives in the city of Minneapolis.

5.      Defendant City of Minneapolis is a municipality incorporated in the State of Minnesota.

6.      The City of Minneapolis oversees the Minneapolis Police Department ("MPD").

7.      Defendant Medaria Arradondo is the Chief of the MPD and a Minnesota resident.

8.      Defendant Robert Kroll is a Lieutenant in the MPD, the president of the Minneapolis Police Federation, and a Minnesota resident.

9.      Defendant John Harrington is the Minnesota Commissioner of Public Safety with supervisory responsibility over Colonel Matthew Langer and the Minnesota State Patrol. Commissioner Harrington is a Minnesota resident.

10.     Defendant Colonel Matthew Langer commands the Minnesota State Patrol ("MSP"). Colonel Langer is a Minnesota resident.

11.     Defendants John Does are unidentified individuals who committed the acts and omissions set forth below as agents of Defendants City of Minneapolis and Minnesota State Patrol.

## JURISDICTION

12.     Plaintiffs' claims arise under 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the First and Fourth Amendment, as incorporated against the States, their agencies, and their municipal divisions through the Fourteenth Amendment.

13.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution and federal law.

## BACKGROUND

14.     On May 25, 2020, erstwhile Minneapolis Police Officer Derek Chauvin killed Minneapolis resident George Floyd by kneeling on his neck for at least eight minutes and forty-six seconds.  Three of his fellow officers stood by as Derek Chauvin killed Mr. Floyd.

15.     Video footage of Mr. Floyd's murder, taken both from bystander cameras and the bodycam footage of Derek Chauvin's accompanying officers, was widely-circulated. Outrage

from the video inspired protests in 93 U.S. cities and several cities internationally.  The written transcripts from the dialogue captured by Mr. Chauvin's bodycam has now been released.

16.     Thousands of protesters gathered in Minneapolis to protest and mourn the murder of Mr. Floyd. In response to these protests, the MPD and the MSP deployed violent crowd control tactics, including the use of the chemical munitions and other less-lethal munitions, on protesters, often with no forewarning or order to disburse.

### *Named-Plaintiffs Nekima Levy Armstrong and Marques Armstrong*

17.     Plaintiffs Nekima Levy Armstrong and her husband Marques Armstrong are active members in the Minneapolis community and have participated in and led a number of protests prior to those following the murder of Mr. Floyd.

18.     On May 26, 2020, Plaintiffs Nekima Levy Armstrong and Marques Armstrong joined community members gathered in Minneapolis, Minnesota, on the corner of 38th Street and Chicago Avenue, the location where Mr. Floyd was murdered, in a demonstration calling for justice in the death of Mr. Floyd.

19.     The demonstration began organically and thousands of people marched from 38th Street and Chicago Avenue for roughly 2.5 miles to the Third Police Precinct, on Minnehaha Avenue, in Minneapolis, Minnesota.[1] The demonstration was largely peaceful.

20.     After arriving at the Third Precinct, at approximately 7:30 pm, most of the protesters began to leave the area. Approximately 50–100 protesters remained, including Plaintiffs Nekima Levy Armstrong and Marques Armstrong, who were standing at the corner of 26th Street

---

[1] Greta Kaul, *Seven Days in Minneapolis: a timeline of what we know about the death of George Floyd and its aftermath*, MINNPOST (May 29, 2020), https://www.minnpost.com/ametro/2020/05/what-we-know-about-the-events-surrounding-george-floyds-death-and-its-aftermath-a-timeline/.

and Lake Street while waiting for their transportation to arrive. There was a smaller group of individuals who were throwing rocks and water bottles behind the Third Precinct.

21.    At about 8 p.m., several squad cars arrived at the Third Precinct with officers dressed in riot gear who began firing less-lethal munitions and chemical irritants—including tear gas and flashbangs—at protesters in the area surrounding the Third Precinct. Neither of Plaintiffs Nekima Levy Armstrong or Marques Armstrong heard any warning or orders to disperse from the MPD.

22.    The MPD did not limit its firing of less-lethal munitions and chemical irritants to areas where individuals were throwing rocks and water bottles behind the Third Precinct.

23.    Though neither of Plaintiffs Nekima Levy Armstrong or Marques Armstrong were hit by these projectiles, they witnessed groups of protesters running from the areas around the Third Precinct and observed the injuries they sustained.

24.    On May 27, 2020, Plaintiffs Nekima Levy Armstrong and Marques Armstrong attended a second night of protests at the Third Precinct. These protests were also largely peaceful.

25.    Because they witnessed the MPD's use of crowd control tactics the previous night, they came prepared with protective gear like goggles and helmets, in case law enforcement targeted them with less-lethal munitions.

26.    When protesters, including Plaintiffs Nekima Levy Armstrong and Marques Armstrong, arrived at the Third Precinct in the early evening, MPD officers were standing on the roof of the precinct. Officers were dressed in riot gear, holding impact weapons and canisters of tear gas.

27.    Sometime between 7:30pm and 8:18pm, without issuing orders to disperse or warnings of tear-gassing, police sprayed tear gas into the crowd.

28.     Mr. Armstrong saw MPD officers take aim and fire less-lethal munitions at a number of individuals who were protesting peacefully. He then witnessed the MPD blanket the crowd of peaceful protesters with tear gas.

29.     Plaintiffs Nekima Levy Armstrong and Marques Armstrong were peacefully demonstrating when they were sprayed with tear gas. After being sprayed with tear gas, they struggled to breathe and were forced to run from the Third Precinct.

30.     When they got a safe distance from the Third Precinct, Plaintiffs rinsed their eyes with milk in an attempt to alleviate the pain caused by the tear gas, but the effects of the gas lingered.

31.     Both Plaintiffs Nekima Levy Armstrong and Marques Armstrong have been sprayed with tear gas before, but they had never experienced tear gas as strong as what the MPD sprayed them with on this night.

32.     Video footage from the incident shows individuals hunched over, gagging, and gasping for air after being tear-gassed.[2]

33.     Plaintiffs Marques Armstrong and Nekima Levy Armstrong experienced tingling and burning sensations in the throat and chest. Both of them had trouble breathing as a result of the tear gas.

34.     Police continued to attack protesters with chemical irritants, less-lethal munitions, and flashbangs as the evening continued.

35.     Windows of businesses near the Third Precinct were broken and stores were looted and vandalized. Police deployed crowd control tactics well into the next morning.

---

[2] John Mehren, *Minneapolis George Floyd Protests – May 27, 2020 – Appx 6-8 PM*, YouTube (May 27, 2020), https://www.youtube.com/watch?v=tfI60s332vg.

36.     Plaintiffs Nekima Levy Armstrong and Marques Armstrong continued to experience burning sensations from the tear gas for a few days afterwards. They both remained hoarse for approximately one week, and are still experiencing residual effects from the tear gas.

37.     Since the MPD sprayed her with tear gas, Plaintiff Nekima Levy Armstrong has had lingering lung issues and her voice has not returned to full strength. She routinely uses her voice as an instrument to lead chants at protests and the damage to her voice as a result of the tear gas has limited her ability to do that.

38.     Plaintiffs Nekima Levy Armstrong and Marques Armstrong still attend protests, but they have protective gear—bulletproof vests, helmets, goggles, gloves, and bandages—on hand for fear of being attacked again by law enforcement with less-lethal munitions.

39.     Since that evening, protests have been and are ongoing. During the many confrontations between law enforcement and protesters, law enforcement has used impact weapons, deployed less-lethal munitions, and utilized chemical irritants against demonstrators without forewarning.

### *Named-Plaintiffs Terry Hempfling and Rachel Clark*

40.     Plaintiff Terry Hempfling has attended a number of protests prior to those following George Floyd's murder and considers herself a seasoned protester. She has experience in non-violent and/or direct action protesting.

41.     Plaintiff Rachel Clark has attended protests prior to those following George Floyd's murder.

42.     On May 26, 2020, Ms. Hempfling joined protesters who were demonstrating near the site of George Floyd's murder. She protested peacefully for the bulk of the day and had no interaction with law enforcement.

43.     On May 26, 2020, Ms. Clark attended a demonstration that began on 38th Street and Chicago Avenue. She remained a couple of blocks away from the core group of protesters in order to maintain social distancing.

44.     On May 27, 2020, Ms. Hempfling joined protesters who were demonstrating near the Third Precinct, located on Minnehaha Avenue. She brought medical supplies with her to provide support to any protesters who might need them.

45.     During the protests, Ms. Hempfling observed law enforcement on the roof of the precinct, but did not observe any on the street near the protesters. There were MPD barricades set up around the precinct and a number of protesters sat and stood peacefully in front of these barricades.

46.     Ms. Hempfling was approximately thirty to forty feet away from the barricades set up in front of the Third Precinct.

47.     Without warning or an order to disperse, MPD officers began firing tear gas at the protesters sitting and standing peacefully in front of the MPD barricades.

48.     MPD officers also fired rubber bullets and/or less-lethal munitions without warning or an order to disperse.

49.     Ms. Hempfling was hit in the back of her right arm by the ricochet of a rubber bullet and/or less-lethal munition fired by the MPD. The picture below depicts the less-lethal munition and the injury it caused to Ms. Hempfling:



50.    Pictures of the less-lethal munition that struck Ms. Hempfling are shown below:





51.     On May 27, 2020, Ms. Clark attended a protest at the Hennepin County Government Center with a group of friends. Eventually, Ms. Clark's friends left but she remained marching with the other protesters. She marched to the end of the highway and saw that the protesters were headed near the Third Precinct.

52.     At this point, Ms. Clark saw armored vehicles turning toward the highway and became frightened by this intimidating show of force and went home immediately.

53.     On May 28, 2020, Ms. Hempfling again joined protesters, who were demonstrating again near the Third Precinct. She did not see law enforcement that night and had no interaction with them.

54.     On May 29, 2020, Ms. Hempfling and Ms. Clark together joined protests happening this time near the Fifth Precinct, located at the corner of Nicollet Ave and E. 31st Street.

55.     After observing law enforcement in previous nights, Ms. Hempfling wanted to avoid any confrontation with law enforcement. They rode their bikes to the protest and in an effort to secure their bikes in a safe location, parked and locked them across the street from the precinct on E. 31st Street.

56.     Ms. Hempfling and Ms. Clark observed the MPD standing on the roof of the precinct and on the ground around the perimeter of the precinct.

57.     As this was the first night of the statewide curfew imposed by Governor Tim Walz, Ms. Hempfling and Ms. Clark stayed out past the curfew, to continue exercising their First Amendment right to protest and to gauge the reaction of law enforcement.

58.     For hours after the curfew started, the MPD had no interaction with protesters. Approximately at 11:30 pm, Ms. Hempfling and Ms. Clark heard an announcement notifying the protesters that they were out past curfew and must disperse.

59.     Ms. Hempfling and Ms. Clark began to disperse immediately. Ms. Hempfling and Ms. Clark went to collect their bikes on E. 31st Street, across from the Fifth Precinct.

60.     As they approached their bikes, they observed that the street was eerily dark, which frightened them. They began to unlock their bikes hurriedly and noticed two rows of MPD officers approaching them from opposite directions, leaving them no means of escape, in a tactic known as "kettling." The officers were approaching from both sides of E. 31st Street.

61.     Ms. Hempfling and Ms. Clark did not observe anyone else on the street, other than one woman and the MPD officers moving towards them.

62.     Within one to two minutes of the dispersal announcement, and without further warning, the MPD began to fire tear gas and rubber bullets and/or less-lethal munitions at Ms. Hempfling, Ms. Clark, and the other woman on the street.

63.     Ms. Hempfling and Ms. Clark realized that because of the MPD lines moving towards them, that they could not exit in any direction via the street and that their only option to escape the MPD closing in on them was to climb over a fence approximately four to five feet high. They were forced to abandon their bikes at the scene.

64.     Ms. Hempfling and Ms. Clark were both disoriented from the tear gas and the rubber bullets and/or less-lethal munitions, but managed to climb over the fence.

65.     Ms.  Hempfling was hit a total of four times by less-lethal munitions on her breast and thigh and twice on her back. She sustained severe bruising as a result from these impacts, particularly to her thigh, which sustained a bruise that ran almost the entire length of her thigh from her hip to her knee.

66.     A picture of the injury to Ms. Hempfling's breast from the less-lethal munitions is shown below:



67.     A picture of the injury to Ms. Hempfling's thigh from the less-lethal munitions is shown below:



Nearly two months later, Ms. Hempfling still has bruises to her breast, thigh, and back.

68.     Ms. Hempfling did not resume protesting for a full week after her encounter with the MPD on May 29, 2020 because she was afraid of being attacked by them again. She has resumed protesting since, but has only done so during the daytime.

69.     Despite attending a number of protests alone prior to those following Mr. Floyd's murder, Ms. Hempfling will not attend any protests alone now. Ms. Hempfling has never been tear gassed or fired upon by law enforcement prior to the protests following George Floyd's murder.

70.     Ms. Clark was hit three times by rubber bullets and/or less-lethal munitions in her arm, right hip and right ankle. A picture of the injury Ms. Clark sustained to her arm is shown below:



71.     Immediately following the impact to her arm, Ms. Clark experienced significant swelling extending out approximately one inch from her body. Nearly two months later, Ms. Clark still has bruising from the rubber bullets and/or less-lethal munitions.

72.     Ms. Clark has never been afraid to protest before but is now. She was physically and emotionally shaken by her encounter with the MPD.

73.     Law enforcement's use of impact weapons, less-lethal munitions and chemical irritants on peaceful protest was widely criticized by local government. According to Minneapolis City Council Member Steve Fletcher, "it was bad choices by Minneapolis police officers that

escalated the situation to the point that it turned into a prolonged week of action."[3] Further, the decision to "deploy tear gas and rubber bullets effectively escalat[ed] the situation from protest to pitched conflict."[4]

## MUNICIPAL ALLEGATIONS

74.  The City of Minneapolis, Minneapolis Chief of Police Medaria Arradondo, Minneapolis Police Lieutenant Robert Kroll, Minnesota Department of Public Safety Commissioner John Harrington, and MSP Colonel Matthew Langer, in their official capacities (collectively the "State and Municipal Defendants") each have policies and customs of violating the constitutional rights of individuals who are peacefully protesting.

75.  The State and Municipal Defendants have been coordinating operations during protests.

76.  The MPD and the MSP have been policing the protests.

77.  The State and Municipal Defendants each have a custom or policy of deploying chemical irritants and less-lethal munitions against protesters.

78.  In May 2015, the MPD deployed chemical irritants on protesters marching down 7th Street in downtown Minneapolis to protest the announcement that police officer Matt Kenny would not be charged criminally in the killing of Tony Robinson, an unarmed Black man.[5]

---

[3] Libor Jany & Liz Navratil, *Union Kroll blasts city's riot response*, STAR TRIBUNE (June 2, 2020), https://www.startribune.com/kroll-minneapolis-police-union-head-blasts-city-s-riot-response-in-letter-to-officers/570928532/.

[4] Steve Flecher, *I'm a Minneapolis City Council Member. We Must Disband the Police—Here's What Could Come Next*, TIME (June 1, 2020) https://time.com/5848705/disband-and-replace-minneapolis-police/.

[5] Brandt Williams & Jon Collins, *Mpls. police chief orders protest probe amid reports of child hurt*. MINN. PUBLIC RADIO NEWS (May 14, 2015), https://www.mprnews.org/story/2015/05/14/minneapolis-police-chief-calls-for-investigation-after-protest.

79.     In November 2015, the MPD deployed chemical irritants on protesters who gathered near the Fourth Precinct in Minneapolis to protest a MPD shooting of Jamar Clark, an unarmed Black man.[6]

80.     The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to constitutionally protected activity amounts to a deliberate indifference to the rights of Plaintiffs and Plaintiff class members.

81.     Defendant Kroll is both a Lieutenant in the MPD and the president of the Minneapolis Police Federation, the union that represents Minneapolis police officers. Kroll's supervisory role is amplified significantly by his position as Federation president. Kroll acts as an unofficial policymaker within the MPD. The MPD's customs and practices derive not just from the command structure within the department, but also informally from Kroll, who acts as a de facto policy maker for a cadre of officers in the department. Kroll actively sows discord between rank-and-file officers and the command structure as a means of further amplifying his policy role and exercising an outsize influence over police culture. What Kroll casts as his "opinions" as union president have the practical effect of serving as policy guidance for officers, which aggravates the training and supervision failures described herein.

82.     On June 2, 2020, Kroll released a statement to Federation members that underscores his role as *de facto* policymaker and his failure to supervise with respect to the particular First Amendment issues described in this Complaint.[7]   Throughout the letter, Kroll reinforces his supervisory role and unofficial policymaker status with regard to the MPD:

---

[6] Don Davis, *Accusations after Unrest Minneapolis police blame outside 'anarchists' for Wednesday turmoil; protesters decry treatment, demand federal action*, St. Paul Pioneer Press, Nov. 20, 2015, at A1.
    https://infoweb.newsbank.com/apps/news/user/librarycard?destination=document-view%3Fp%3DAWNB%26docref%3Dnews/1593F4D9CB1259C0.
[7] https://minnesota.cbslocal.com/2020/06/01/mpd-union-leader-releases-letter-to-officers-critical-of-minneapolis-leadership/.

> "I've had numerous conversations with politicians at the state level. I gave a detailed plan of action including a range of 2000 to 3000 National Guard, their deployment allocations throughout our city and St. Paul, in a phone meeting with Senate majority leader Paul Gazelka."

He further sows discord between police officers and local political leadership by encouraging the conduct of the MPD:

> "I commend you for the excellent police work you are doing in keeping your coworkers and others safe during what everyone except us refuses to call a riot . . . . The politicians are to blame and you are the scapegoats."

83.     Not once does Kroll recognize the constitutional right of Minneapolis citizens to assemble peacefully and instead couches the events of the days leading up to his letter as a "riot," "the largest scale riot Minneapolis has ever seen," a "record breaking riot," and a "terrorist movement."  He further encourages the use of gas munitions and less-lethal munitions by officers "to defend themselves."

84.     The State and Municipal Defendants each have a history of deficient or non-existent training with respect to the use of impact weapons, chemical irritants, and less-lethal munitions.

85.     During the protests following Mr. Floyd's killing, the MSP without warning fired less-lethal munitions, including at least 40 mm crushable foam rounds, at vehicles and people outside past the statewide curfew.[8]

86.     The MSP has refused to identify to the public the weapons that it has used against protesters in the wake of George Floyd's murder.[9]

---

[8] A.J. Lagoe, Steve Eckert, *KARE 11 Investigates: State refuses to identify weapons used against protesters*, KARE11 (June 10, 2020) https://www.kare11.com/article/news/local/george-floyd/kare-11-investigates-state-refuses-to-identify-weapons-used-against-protesters/89-f84b25d8-d7b7-4240-aa7b-f6dcb9583b9e.

[9] *See id.*

87.     The MPD has admitted to use of 40 mm less-lethal foam marking rounds.[10]

88.     The State and Municipal Defendants each have a custom or policy of failing to provide warnings and/or dispersal orders before deploying crowd control weapons, including use of chemical agents and injurious, less-lethal munitions, against protesters.

89.     The State and Municipal Defendants each have a custom or policy authorizing the deployment of crowd control weapons and/or less-lethal munitions in an unconstitutional manner.

90.     On information and belief, neither the MPD nor the MSP have investigated, disciplined, or suspended any officer involved in any of the unlawful conduct described in this Complaint.

91.      The Minneapolis Policy and Procedure Manual ("MPPM") §§ 5-312 and 5-313 authorize the use of force in times of civil disturbance.

92.     On June 1, 2020, the Minnesota Department of Human Rights filed a charge of discrimination against the MPD, alleging discrimination against people of color, particularly Black community members, which deprived them of their civil rights.[11] The charge noted that the killing of Mr. Floyd on May 25, 2020 and other similar incidents "since at least January 1, 2010, and continuing to the present, require investigation into whether the respondent's training, policies, procedures, practices, including but not limited to use of force protocols, and any corresponding implementation, amounts to unlawful race-based policing."[12]

---

[10] Liz Szabo, *Rubber bullets can kill, blind or maim people for life, but authorities continue to use them,* USA Today, (June 3, 2020) https://www.usatoday.com/story/news/health/2020/06/03/rubber-bullets-less-lethal-weapons-can-kill-but-still-used/3134019001/.

[11] Charge of Discrimination, *State v. City of Minneapolis Police Dept.*, 27-CV-20-8182 (June 2, 2020), https://www.minnpost.com/wp-content/uploads/2020/06/71537-LUCERO-REBECCA-ECP-Charge-of-Discrimination-Notarized-6-2-2020-CJ.pdf.

[12] *Id.*

93.     On June 5, 2020, the City of Minneapolis and the Minnesota Department of Human Rights voluntarily stipulated that the MPD would amend various MPD policies, including MPPM § 5-313 regarding use of crowd control weapons, to require that during protests and demonstrations, use of such weapons could only be used if authorized by the Chief of Police or its designee.[13] MPPM §§ 5-312, 5-313 and 7-805 have been amended as a result of this stipulation. The stipulation does not provide a mechanism for enforcement by any party other than the Minnesota Department of Human Rights.

94.     The earlier version of MPPM § 5-312, dated August 17, 2007, governing civil disturbances, provided that "[u]nless there is immediate need to protect oneself or another from apparent physical harm, sworn MPD employees shall refrain from deploying any less-lethal or non-lethal weapons upon any individuals involved in a civil disturbance until it has been authorized by the on-scene commander." It included no language preventing the MPD from using crowd control weapons on protesters exercising their constitutional right of freedom of assembly.

95.     MPPM § 5-312, amended on June 16, 2020, now states that during "protests and demonstrations" authorization for use of "crowd control weapons" such as chemical agents, rubber bullets and flash-bangs "shall only come from the Chief of Police, or if the Chief is unavailable, the Chief's designee at the rank of Deputy Chief or above."[14] It provides no guidance as to when during a protest or demonstration it would be appropriate for the Chief of Police to authorize the use of crowd control weapons.

96.     Similarly, the prior version of MPPM § 5-313, dated September 4, 2012, governing the policy regarding use of chemical agents, approved the "use of chemical agents as long as it

---

[13] *See* Stipulation and Order at 5, *State v. City of Minneapolis Police Dep't.*, 27-CV-20-8182 (June 8, 2020).
[14] *Id.*

complied with current MPD training and MPD policies governing the use of force…during crowd control situations if authorized by a supervisor." It did not prohibit the MPD from using chemical agents on protesters exercising their constitutional right of freedom of assembly. It further provided only a vague reference to "current MPD training and MPD policies governing the use of force" and did not cite to any specific MPD policy regarding use of force that would be applicable to use of chemical agents.

97.     MPPM § 5-313, amended on June 16, 2020, now specifies that approved chemical agents may be used "during crowd control situations only when authorized in accordance with 5-312." Notably, both versions of MPPM § 5-313 prohibit the use of chemical agents against "persons who are only displaying Passive Resistance," which MPPM § 5-302 defines as "behavior initiated by a subject, when the subject does not comply with verbal or physical control efforts, yet the subject does not attempt to defeat an officer's control efforts."

98.     Likewise, MPPM § 7-805, dated April 20, 2001, governing civil disturbances, mandated that "MPD personnel will not interfere with lawful protests and/or demonstrations." Only as a secondary level of assistance could an Emergency Response Unit ("ERU") be activated to "deploy chemical/less lethal munitions as necessary and in accordance with MPD policies for its use."

99.     MPPM § 7-805, amended on June 16, 2020, now mandates that during "protests and demonstrations, use of all crowd control weapons must be authorized only by the Chief of Police, or if the Chief is unavailable, the Chief's designee at the rank of Deputy Chief or above (in accordance with [MPPM] § 5-312)."

100.    Finally, MPPM § 5-317, unaffected by the stipulation, governs the use of less-lethal 40mm launcher and impact projectiles, and explicitly states that "[o]fficers shall not deploy 40mm

launchers for crowd management purposes." It further requires that "[p]rior to using less-lethal options, officers need to consider any risks to the public or themselves" and "consideration shall be given as to whether the subject could be controlled by any other reasonable means without unnecessary risk to the subject, officers, or to the public."

101.   MPPM § 5-317 provides procedures and regulations that govern bodily target areas for use of 40mm less-lethal rounds, specifying primary target areas as "the large muscle groups in the lower extremities including the buttocks, thigh, knees" and alternatively "the ribcage area to the waist, and the larger muscle areas of the shoulder areas."  It also provides that "[a]reas to avoid when using the 40mm less-lethal round are the head, neck, spinal cord, groin and kidneys" and that "[a]reas susceptible to death or possible severe injury are the head, neck, throat and chest (in vicinity of the heart)."

102.   Despite its many authorizations for use of crowd control weapons, the MPPM has no policy requiring MPD to notify protesters to disperse or warn protesters before its use of crowd control weapons.

103.   Regarding the protests surrounding Mr. Floyd's killing, the State and Municipal Defendants have acknowledged their use of tear gas and less-lethal munitions through May 31, 2020.[15]

104.   The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to use of "crowd control" tactics amounts to a deliberate indifference to the rights of Plaintiffs and Plaintiff class members.

---

[15] *See* Decl. of Scott Gerlicher, Commander of MPD ¶ 14*, Goyette v. City of Minneapolis*, No. 20-cv-01302 (WMW-DTS) (D. Minn. June 5, 2020), ECF No. 27; Decl. of Matthew Langer, Colonel of the Minn. State Patrol ¶ 4, *Goyette v. City of Minneapolis*, No. 20-cv-01302 (WMW-DTS) (D. Minn. June 5, 2020), ECF No. 28.

105.    Minneapolis Ord. 466.240 is directed to assemblies obstructing pedestrian or vehicular traffic.

106.    Minneapolis Ord. 385.65 is directed to interference with pedestrian or vehicular traffic.

107.    The State and Municipal Defendants have a custom or policy of enforcing Minneapolis Ord. 466.240, which defines the offense of assemblies obstructing pedestrian or vehicular traffic, in an unconstitutional way, and have done so on occasions before these particular protests.

108.    Minneapolis Ord. 466.240 "shall not be interpreted to restrict the lawful exercise of freedom of speech and assembly." Minneapolis Ord. 466.240 provides no definition of what constitutes "lawful exercise of freedom of speech and assembly."

109.    The State and Municipal Defendants have a custom or policy of enforcing Minneapolis Ord. 385.65, which defines interference with pedestrian or vehicular traffic, in an unconstitutional way, and have done so on occasions before these particular protests.

110.    Minneapolis Ord. 385.65 provides that "[a]cts authorized as an exercise of one's constitutional rights of freedom of speech and assembly" shall not constitute interference with pedestrian or vehicular traffic.

111.    Minneapolis Ord. 385.65 leaves open for interpretation who can "authorize" acts and which acts are "authorized" as an exercise of one's constitutional rights of freedom of speech and assembly.

112.    The State and Municipal Defendants used less-lethal and chemical munitions on peaceful protesters in flagrant disregard of the health and safety of protesters in light of the COVID-19 pandemic.

113.    For example, medical professionals and students have noted that use of "tear gas, smoke, or other respiratory irritants [ ] could increase risk for COVID-19 by making the respiratory tract more susceptible to infection, exacerbating existing inflammation, and inducing coughing."[16]

114.    The State and Municipal Defendants used less-lethal munitions on peaceful protesters contrary to manufacturer guidelines.

115.    For example, one manufacturer of the Direct Impact 40mm Extended Range OC Crushable Foam Round and the Direct Impact LE 40 MM Extended Range CS Crushable Foam Round states that they "should only be used at ranges beyond 10 meters, targeting the subject's lower torso or extremities."[17]  A manufacturer of the eXact iMpact™ 40mm Sponge Round states that it has an "optimal energy range of approximately 5–36 meters, although it may be used in situations from 2–50 meters" which "offers the necessary energy and accuracy to target the large muscle groups of the buttocks, thigh, and even the knees of the subject. These areas provide sufficient pain stimulus, while greatly reducing serious or life-threatening injuries."[18]

116.    On May 26, 2020–May 29, 2020, Plaintiffs were engaged in lawful exercise of their constitutional rights of freedom of speech and assembly.

117.    The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to First Amendment protected activity amounts to a deliberate indifference to the rights of Plaintiffs and Plaintiff class members.

---

[16] Carla K. Johnson, *Can tear gas and pepper spray increase virus spread?* ABC, (June 8, 2020) https://abcnews.go.com/Health/wireStory/tear-gas-pepper-spray-increase-virus-spread-71136544.

[17] Defense Technology, 40mm Direct Impact® Extended Range OC,CS, Inert & Marking, The Safariland Group (2015) https://www.defense-technology.com/wp-content/uploads/2020/06/40mm-Direct-Impact-LE-Extended-Range-Round.pdf.

[18] Defense Technology, 40mm eXact iMpact SPONGE ROUND. The Safariland Group (2015) https://www.safariland.com/on/demandware.static/-/Sites-tsg-Library/default/dw8d409bfe/product-pdfs/less-lethal/40mm_eXact_iMpact_Sponge_Round_6325.pdf.

118.     The State and Municipal Defendants are fully cognizant of the constitutional rights they are failing to protect.

## CLASS ALLEGATIONS

119.     Under Rules 23(a) and 23(b)(1) and (2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action for prospective relief on behalf of themselves and other similarly situated people who have participated in peaceful protest activity following the death of George Floyd in public places within the City of Minneapolis and who have experienced law enforcement's use of crowd control tactics while engaging in the aforementioned protest activity (the "Plaintiff Class").

120.     The Plaintiff Class is so numerous that joinder of all the members would be impracticable. Thousands of individuals have peacefully protested in Minneapolis.

121.     As a result of the State and Municipal Defendants' customs and policies of indiscriminately attacking protesters with less-lethal munitions and chemical irritants without constitutionally adequate justification or warning, denying them freedom of movement to participate in public demonstrations, the Plaintiff Class have been deprived of their constitutional rights under the First, Fourth, and Fourteenth Amendments.

122.     Plaintiffs will fairly and adequately protect the interests the interests of the Plaintiff Class. Plaintiffs have no conflicts involving other class members or Defendants. Plaintiffs understand their role as class representatives and their duties to the class in this litigation. Plaintiffs are represented by competent and skilled counsel whose interests are fully aligned with the interests of the class.

123.     Questions of law or fact are common to the class. These legal and factual questions include but are not limited to:

a.    Do the State and Municipal Defendants provide sufficient notice before deploying "crowd control" tactics, including less-lethal munitions and chemical irritants?

b.    Were "crowd control" tactics used for impermissible purposes?

c.    Have the State and Municipal Defendants insufficiently trained law enforcement officials regarding the use of "crowd control" tactics?

d.    Do the State and Municipal Defendants have sufficient policies in place to ensure that the constitutional rights of the Plaintiff Class are protected?

e.    Whether Minneapolis Ords. 466.240 and 385.65 are unconstitutionally vague on their faces and/or as applied to the Plaintiff Class.

f.    Whether the State and Municipal Defendants enforce Minneapolis Ords. 466.240 and 385.65 in an unconstitutional manner.

g.    Have the State and Municipal Defendants exhibited a deliberate indifference to the unconstitutional conduct alleged herein?

124.    Reviewing individual actions creates a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A).

125.    This case involves "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications." Fed. R. Civ. P. 23(b)(1)(A). For example, the outcome of this matter would likely affect all future protesters and law enforcement.

126.    Finally, "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(1)(A). There is no allegation that Plaintiffs have been targeted because of anything unique to them as individuals. Rather, they have been targeted because of their participation in peaceful protests. Plaintiffs' targeting exists only by virtue of a broader pattern and practice of unconstitutional conduct directed at protesters as a class.

**CAUSES OF ACTION**

**COUNT I:**
**FIRST AMENDMENT—RETALIATION, 42 U.S.C. § 1983**

127.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

128.    Plaintiffs and the Plaintiff Class engaged in constitutionally protected acts of freedom of speech and the right to assemble, by participating in public demonstrations.

129.    Defendants retaliated against Plaintiffs and the Plaintiff Class for engaging in constitutionally protected activity. Defendants' retaliation is part of a pattern or practice of unconstitutional conduct that is certain to continue absent any relief.

130.    These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiffs and the Plaintiff Class from participating in constitutionally protected demonstrations in a public place.

131.    It was the State and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused the First Amendment retaliation.

132.    The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to the First Amendment rights of Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for First Amendment violations, amounts to deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

133.    The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class that occurred in the protests following George Floyd's death demonstrates the deliberate indifference of the State and Municipal Defendants to the rights of Plaintiffs and the Plaintiff Class.

134.    Further, given the multiple constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State and Municipal Defendants demonstrated their deliberate indifference to the need for such training and supervision.

135.    Plaintiffs' First Amendment rights were violated when law enforcement fired chemical and other less-lethal munitions on them while peacefully protesting.

136.    Plaintiffs and the Plaintiff Class reasonably fear further retaliation in the future if they continue to protest or participate in constitutionally protected activity.

**COUNT II:**
**FOURTH AMENDMENT—UNLAWFUL SEIZURE AND EXCESSIVE FORCE**

137.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

138.    Plaintiffs and the Plaintiff Class were seized by Defendants when their officers intentionally, through the use of force, chemical irritants, and less-lethal munitions, terminated their freedom of movement.

139.    Defendants committed these acts without warning and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

140.    Plaintiffs and the Plaintiff Class did not pose a threat to any of Defendants' officers or agents or any other person.

141.    It was the State and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused the unlawful seizures and excessive use of force.

142.    The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to the Fourth Amendment rights of Plaintiffs and the Plaintiff Class,

including a failure to investigate and discipline officers for Fourth Amendment violations, amounts to deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

143.    The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class that occurred in the protests following George Floyd's death demonstrates the deliberate indifference of the State and Municipal Defendants to the rights of Plaintiffs and the Plaintiff Class.

144.    Further, given the pattern and practice of constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State and Municipal Defendants demonstrated their deliberate indifference to the need for such training and supervision.

145.    Plaintiffs' Fourth Amendment rights were violated when law enforcement fired chemical and other less-lethal munitions on them while peacefully protesting.

146.    Plaintiffs and the Plaintiff Class reasonably fear further retaliation in the future in violation of the Fourth Amendment if they continue to protest or participate in constitutionally protected activity.

## COUNT III:
### FOURTEENTH AMENDMENT—PROCEDURAL DUE PROCESS

147.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

148.    The Due Process rights of Plaintiffs and the Plaintiff Class were violated when the State and Municipal Defendants, through their officers and agents deployed chemical irritants and less-lethal munitions without providing a warning and opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with.

149.     The State and Municipal Defendants' failure to implement policies protecting, supervise, and train their employees and agents with respect to the Due Process rights of Plaintiffs and the Plaintiff Class, amounts to deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

150.     The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class that occurred in the protests following George Floyd's death demonstrates the deliberate indifference of the State and Municipal Defendants to the rights of Plaintiffs and the Plaintiff Class.

151.     Plaintiffs' Due Process rights were violated when law enforcement fired chemical and other less-lethal munitions on them without notice and an opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with.

152.     Plaintiffs and the Plaintiff Class reasonably fear further violation of the right to due process in the future if they protest or participate in constitutionally protected activity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and as a representative of the class defined herein, pray for relief as follows:

A.     Enter judgment in favor of Plaintiffs and against Defendants;

B.     A declaration that Defendants' conduct violated the First, Fourth, and Fourteenth Amendments of the U.S. Constitution;

C.     A permanent injunction barring Defendants from engaging in unconstitutional conduct against protesters;

D.     A determination that this action may proceed as a class action under Rule 23(b)(1) or 23(b)(2) of the Federal Rules of Civil Procedure;

E.     Designation of Plaintiffs as Class Representative and designation of Plaintiffs' counsel as class counsel;

F.     Damages compensating Plaintiffs for their injuries, including but not limited to compensatory, and pecuniary damages;

G.      An award of pre-judgment interest;

H.      An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

I.      An award of such other and further relief as the Court deems equitable and just.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all issues triable pursuant to Rule 38 of the

Federal Rules of Civil Procedure.

Dated:  July 28, 2020                                FISH & RICHARDSON P.C.


                                   By:  */s/ Michael E. Florey*
                                        Michael E. Florey (#0214322)
                                        florey@fr.com
                                        Veena V. Tripathi (#0401111)
                                        tripathi@fr.com
                                        FISH & RICHARDSON P.C.
                                        3200 RBC Plaza
                                        60 South 6th Street
                                        Minneapolis, MN 55402
                                        Tel: (612) 335-5070
                                        Fax: (612) 288-9696

                                        Ahmed J. Davis (*pro hac vice* to be filed)
                                        davis@fr.com
                                        FISH & RICHARDSON P.C.
                                        1000 Maine Avenue, S.W. Suite 1000
                                        Washington, D.C. 20024
                                        Tel: (202) 783-5070
                                        Fax: (202) 783-2231

                                        Excylyn J. Hardin-Smith (*pro hac vice* to be filed)
                                        Hardin-smith@fr.com
                                        FISH & RICHARDSON P.C.
                                        7 Times Square, 20th Floor
                                        New York, NY 10036
                                        Tel: (212) 765-5070
                                        Fax: (212) 258-2291

                                        Teresa J. Nelson (#0269736)
                                        tnelson@aclu-mn.org
                                        AMERICAN CIVIL LIBERTIES
                                        UNION OF MINNESOTA
                                        P.O. Box 14720
                                        Minneapolis, MN 55414
                                        Tel: (651) 645-4097

                                        ***Attorneys for Plaintiffs***

**ACKNOWLEDGMENT**

The undersigned hereby acknowledges that sanctions may be imposed under Minn. Stat.

§ 549.211.

Dated: July 28, 2020                              */s/ Michael E. Florey*

                                              _____

                                              Michael E. Florey