## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Nekima Levy Armstrong, Marques Armstrong, Terry Hempfling, Rachel Clark, and Max Fraden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo, *in his individual and official capacity*; Minneapolis Police Lieutenant Robert Kroll, *in his individual and official capacity*; Minnesota Department of Public Safety Commissioner John Harrington, *in his individual and official capacity*; Minnesota State Patrol Colonel Matthew Langer, *in his individual and official capacity*; and John Does 1-2, *in their individual and official capacities*,<br><br>Defendants. | Case No. 20-cv-01645 (SRN/DTS)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Ahmed J. Davis, Fish & Richardson, 1000 Maine Avenue Southwest, Suite 1000, Washington D.C., 20024; Clare A. Diegel, Isabella Salomao Nascimento, and Teresa J. Nelson, ACLU of Minnesota, P.O. Box 14720, Minneapolis, MN 55414; Excylyn Hardin-Smith, Fish & Richardson, 7 Times Square, Twentieth Floor, New York, NY 10036; and Michael E. Florey and Veena Tripathi, Fish & Richardson P.C., 60 South Sixth Street, Suite 3200, Minneapolis, MN 55402, for Plaintiffs.

Heather Passe Robertson, Kristin R. Sarff, and Sharda R. Enslin, Minneapolis City Attorney's Office, 350 South Fifth Street, Suite 210, Minneapolis, MN 55415, for the City of Minneapolis and Medaria Arradondo.

Joseph A. Kelley and Kevin M. Beck, Kelly & Lemmons, P.A., 2350 Wycliff Street, Suite 200, St. Paul, MN 55114-1331, for Robert Kroll.

Joseph D. Weiner, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1100, St. Paul, MN 55101, for John Harrington and Matthew Langer.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Motions to Dismiss [Doc. Nos. 23, 29, 33] filed by the City of Minneapolis and Medaria Arradondo (collectively, "the City Defendants"), John Harrington and Matthew Langer (collectively, "the State Defendants"), and Robert Kroll. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **GRANTS in part** and **DENIES in part** the City Defendants' motion, **GRANTS** the State Defendants' motion, and **DENIES** Defendant Kroll's motion.

## I.    BACKGROUND

On May 25, 2020, George Floyd tragically died in the custody of the Minneapolis Police Department, triggering widespread demonstrations across the country. In the following days, protesters took to the streets of Minneapolis—and in some cases, there were riots, as looters and arsonists embedded themselves in groups of otherwise peaceful protesters. This litigation—and several similar lawsuits—arises from the state and municipal response to the challenging circumstances of the George Floyd protests. Plaintiffs are several Minneapolis residents who participated peacefully in the protests. They allege that members of the Minneapolis Police Department ("MPD") and the Minnesota State Patrol ("MSP") responded to the protests with excessive force, in violation of their constitutional rights. Namely, Plaintiffs allege that they, and other peaceful

protesters like them, were subjected to tear gas, rubber bullets, and other "less-lethal munitions," without warning and despite the peaceful nature of their demonstrations. Accordingly, Plaintiffs seek relief under 42 U.S.C. § 1983 for violations of their First, Fourth, and Fourteenth Amendment rights.

Defendants are the City of Minneapolis; Medaria Arradondo, in his individual capacity and in his capacity as the MPD's Chief of Police; Minnesota Department of Public Safety Commissioner John Harrington and MSP Colonel Matthew Langer, in their individual and official capacities; Lieutenant Robert Kroll, the president of the Police Officers Federation of Minneapolis ("the Federation"); and the John Doe officers involved in the use of force against Plaintiffs.

Defendants move to dismiss the claims against them. The City Defendants argue that the Amended Complaint fails to state a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and that the claims against Chief Arradondo in his individual capacity are not well-pleaded. The State Defendants argue that the claims against them are not well-pleaded, are barred by the Eleventh Amendment and qualified immunity, and that Plaintiffs lack standing. And Kroll argues that the allegations against him pertain to his actions as president of the Federation, a role in which he did not act under color of state law, and that the First Amendment bars the claims against him.

Against this backdrop, the Court turns to the record pertinent to Defendants' motions. The Court will begin with Plaintiffs' involvement in the George Floyd protests and the alleged police misconduct they witnessed, and will then examine the allegations related to Kroll's involvement in the MPD's response to the protests.

3

A.     **Nekima Levy Armstrong and Marques Armstrong**

On May 26, 2020, Plaintiffs Nekima Levy Armstrong and Marques Armstrong joined protesters gathered at the corner of 38th Street and Chicago Avenue in Minneapolis. (Am. Compl. [Doc. No. 19], at ¶ 19.) The protesters, numbered in the "thousands," then marched roughly 2.5 miles to Minneapolis's Third Police Precinct, and were largely peaceful. (*Id.* ¶ 20.) After arriving at the Third Precinct, at around 7:30 p.m., the protesters began to leave the area until approximately 50 to 100 protesters remained. (*Id.* ¶ 21.) The Armstrongs remained near these protesters as they waited for their transportation to arrive. (*Id.*) It is alleged that a "smaller group" of individuals at the Third Precinct were "throwing rocks and water bottles behind the Third Precinct." (*Id.*)

Around 8:00 p.m., several squad cars carrying MPD officers dressed in riot gear arrived. (*Id.* ¶ 22.) It is alleged that these officers "began firing less-lethal munitions and chemical irritants—including tear gas and flashbangs" at the protesters without issuing "any warning or orders to disperse." (*Id.*) The MPD officers allegedly did not limit their fire to the groups of protesters throwing rocks and water bottles behind the Third Precinct. (*Id.* ¶ 23.) Although the Armstrongs were not injured that night, they allegedly witnessed "groups of protesters running from the areas around the Third Precinct and observed the injuries they sustained." (*Id.* ¶ 24.)

On May 27, 2020, the Armstrongs attended a second night of protests at the Third Precinct. (*Id.* ¶ 25.) After their experiences the previous night, they wore "protective gear like goggles and helmets." (*Id.* ¶ 26.) When the Armstrongs and other protesters arrived at the Third Precinct, they saw MPD officers standing on the building's roof, and officers

dressed in riot gear and holding "impact weapons and canisters of tear gas." (*Id.* ¶ 27.) Although the protests were "largely peaceful," it is alleged that sometime between 7:30 and 8:18 p.m. MPD officers began spraying tear gas into the crowd—without issuing orders to disperse or other warnings. (*Id.* ¶¶ 25, 28.) Marques Armstrong allegedly witnessed MPD officers "take aim and fire less-lethal munitions at a number of individuals who were protesting peacefully," and saw the MPD "blanket the crowd of peaceful protesters with tear gas." (*Id.* ¶ 29.) The Armstrongs allege that they were peacefully demonstrating, but were sprayed with tear gas. (*Id.* ¶ 30.) Struggling to breathe, they ran from the Third Precinct. (*Id.*) It is alleged that MPD officers continued to employ chemical irritants, less-lethal munitions, and flashbangs throughout that evening. (*Id.* ¶ 35.)

### B.    Terry Hempfling and Rachel Clark

On May 27, 2020, Plaintiff Terry Hempfling joined demonstrators at the Third Precinct and observed MPD officers on the building's roof, but did not see officers near the protesters outside the building. (*Id.* ¶¶ 45-46.) Hempfling alleges that MPD barricades surrounded the building, and a number of protesters "sat and stood peacefully in front of these barricades." (*Id.* ¶ 46.) It is alleged that MPD officers fired tear gas at the protesters sitting and standing peacefully in front of the barricades, as well as "rubber bullets and/or less-lethal munitions," without warning or an order to disperse. (*Id.* ¶¶ 48-49.) Hempfling, standing thirty to forty feet away from the barricades, was hit in the back of her right arm by the ricochet of a rubber bullet or less-lethal munition. (*Id.* ¶¶ 50-51.)

On May 29, 2020, Hempfling and Plaintiff Rachel Clark joined protesters near Minneapolis's Fifth Precinct. (*Id.* ¶ 55.) May 29 marked the first night of a curfew imposed

5

by Governor Tim Walz, and Hempfling and Clark remained at the protest after the curfew started. (*Id.* ¶ 58.) Hempfling and Clark observed MPD officers on the roof of the building and on the ground around the building's perimeter. (*Id.* ¶ 57.) It is alleged that the MPD did not interact with the protesters until 11:30 p.m., when they announced that the protesters were out past the curfew and ordered them to disperse. (*Id.* ¶ 59.) Hempfling and Clark allegedly began to disperse immediately, and crossed the street to the bicycles they had secured nearby. (*Id.* ¶ 60.) Hempfling and Clark allege that as they began to unlock their bicycles, they saw two rows of MPD officers approaching them from opposite directions, "leaving them no means of escape, in a tactic known as 'kettling.'" (*Id.* ¶ 61.) Hempfling and Clark observed only one other protester on the street between the rows of MPD officers. (*Id.* ¶ 62.)

Within a couple minutes of the dispersal announcement and without further warning, MPD officers allegedly began to fire tear gas, rubber bullets, and less-lethal munitions at Hempfling, Clark, and the other protester on the street. (*Id.* ¶ 63.) Trapped between the rows of advancing officers and disoriented by the tear gas, Hempfling and Clark abandoned their bicycles and climbed over a nearby fence. (*Id.* ¶¶ 64-65.) Hempfling was hit four times by less-lethal munitions, causing severe bruising on her breast, thigh, and back. (*Id.* ¶¶ 66-68.) Clark was hit three times by rubber bullets or less-lethal munitions, causing significant swelling and bruising on her arm, hip, and ankle. (*Id.* ¶¶ 71-72.)

### C.    Max Fraden

Plaintiff Max Fraden joined protesters at 38th Street and Chicago Avenue on May 26, 2020, and remained with the group as it gathered at the Third Precinct. (*Id.* ¶¶ 75-76.) It is alleged that the protests were largely peaceful, but for "a small group of people banging on the precinct doors and damaging windows of the precinct and police cars." (*Id.* ¶ 76.) Between 8:30 and 10:00 p.m., Fraden observed numerous MPD cruisers approaching the precinct. (*Id.* ¶ 77.) It is alleged that once the officers arrived, they began "spraying tear gas indiscriminately into the crowd" gathered outside the Third Precinct. (*Id.* ¶ 77.) Fraden alleges that he heard no warnings or orders to disperse, but was sprayed with tear gas. (*Id.* ¶ 78.)

On May 27, 2020, Fraden again joined protesters at the Third Precinct. (*Id.* ¶ 80.) Fraden alleges that the situation was "very tense," and that MPD officers fired tear gas, rubber bullets, and less-lethal munitions multiple times at protesters. (*Id.* ¶ 81.) Fraden was hit by tear gas multiple times. (*Id.*) Fraden, a doctor, provided medical aid to protesters and treated two head lacerations. (*Id.* ¶ 82.)

On May 28, 2020, Fraden rejoined the protests at the Third Precinct. (*Id.* ¶ 83.) Fraden, wearing a white physician's coat and holding only a sign he had created for the protests, allegedly approached an officer and began talking to him. (*Id.* ¶ 84.) Fraden alleges that the officer "turned towards him and aimed a gun directly at him, at fairly close range, and stated 'If you come closer to me, I will shoot you.'" (*Id.* ¶ 85.)

Fraden joined another protest near Interstate 35W in downtown Minneapolis on May 31, 2020. (*Id.* ¶ 88.) It is alleged that approximately 150 people participated in the

demonstration, and were peaceful—with some protesters kneeling on the ground in a form of prayer. (*Id.* ¶ 89.) Fraden alleges that MPD and MSP officers arrived, and began firing less-lethal munitions at the crowd, who began to scatter. (*Id.* ¶ 90.) MPD and MSP officers allegedly fired tear gas at the fleeing protesters, and Fraden was again tear-gassed. (*Id.* ¶¶ 91-93.) MPD and MSP officers then "kettled" the protesters so that they could not escape, and once the encirclement was complete, MPD and MSP officers allegedly sprayed the protesters with tear gas again. (*Id.* ¶¶ 94-97.) Fraden alleges that he never heard the officers issue any warning or order to disperse. (*Id.* ¶ 98.) Thereafter, MPD and MSP officers began arresting the protesters, and Fraden was arrested by an MSP officer. (*Id.* ¶ 99.)

### D.    Allegations Regarding Robert Kroll

Defendant Kroll is a lieutenant in the MPD, and serves as the president of the Minneapolis Police Federation, a labor union that represents MPD officers. (*Id.* ¶ 111.) Plaintiffs allege that Kroll's position as president of the Federation "amplify[ies] significantly" the supervisory role he plays in the MPD, and that Kroll "acts as an unofficial policymaker within the MPD." (*Id.*) It is alleged that Kroll, "a de facto policy maker for a cadre of officers" in the MPD, "actively sows discord between rank-and-file officers and the command structure as a means of further amplifying his policy role and exercising an outsize[d] influence over police culture." (*Id.*)

As an example of Kroll's conduct "aggravat[ing] the training and supervision failures" alleged in the Amended Complaint, Plaintiffs point to a June 2, 2020 statement Kroll released to Federation members. (*Id.* ¶¶ 111-12.) In the letter, Kroll stated that he

"had numerous conversations with politicians at the state level," and "gave a detailed plan of action including a range of 2000 to 3000 National Guard, their deployment allocations throughout our city and St. Paul" to state Senate Majority Leader Paul Gazelka. (*Id.* ¶ 112.) Plaintiffs allege that, after reinforcing his "policymaker status" with those comments, Kroll "further sow[ed] discord between police officers and local political leadership by encouraging the conduct of the MPD" with the following statement:

> I commend you for the excellent police work you are doing in keeping your coworkers and others safe during what everyone except us refuses to call a riot . . . . The politicians are to blame and you are the scapegoats.

(*Id.*) Plaintiffs assert that the letter did not "recognize the constitutional right of Minneapolis citizens to assemble peacefully," and characterized the George Floyd protests in incendiary terms such as a "riot," "the largest scale riot Minneapolis has ever seen," a "record breaking riot," and a "terrorist movement." (*Id.* ¶ 113.)

## II.     DISCUSSION

### A.     Standard of Review

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the facts alleged in the complaint as true, and views those allegations in the light most favorable to the plaintiff. *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). However, the Court need not accept as true wholly conclusory allegations or legal conclusions couched as factual allegations. *Id.* In addition, the Court ordinarily does not consider matters outside the pleadings on a motion to dismiss. *See* Fed. R. Civ. P. 12(d). Matters outside the pleadings include "any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely

reiterate what is said in the pleadings," as well as statements of counsel at oral argument that raise new facts not alleged in the pleadings. *Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 948 (8th Cir. 1999). The Court may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (quoting *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010)).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). Where a motion to dismiss is based on an affirmative defense, such as qualified immunity, the moving party must show that it is entitled to the defense on the face of the complaint. *Dadd v. Anoka Cty.*, 827 F.3d 749, 754 (8th Cir. 2016).

### B.     The City Defendants' Motion to Dismiss

The Court first turns to the Motion to Dismiss filed by the City Defendants. The City Defendants argue that the Amended Complaint fails to state a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and that the claims against Chief Arradondo in his individual capacity are not well-pleaded. The Court will begin with Plaintiffs' *Monell* claim.

###### 1.   *Monell* Claim Against the City Defendants

Under *Monell*, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Rather, a municipality may be liable for a police officer's constitutional violation only if "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* "Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee." *Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016) (citing *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013)).

The gravamen of Plaintiffs' claim is that an unofficial custom was the moving force behind MPD officers' allegedly unconstitutional use of force against them.[1] "To trigger municipal liability based on [an] unofficial municipal custom, the custom must be so pervasive among non-policymaking employees of the municipality that it effectively has the force of law." *Id.* at 986 (citing *Ware v. Jackson Cty.*, 150 F.3d 873, 880 (8th Cir. 1998)). In order to establish a *Monell* custom claim, the plaintiff must show:

> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

---

[1] Plaintiffs also assert that *Monell* liability attaches under the official municipal policy and deliberately indifferent failure to train or supervise theories. Because the Court ultimately concludes that the Amended Complaint states a *Monell* claim under an unofficial custom theory, the Court declines to address Plaintiffs' alternative theories at this time.

2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013) (quotation omitted). Because the City Defendants do not appear to dispute that Plaintiffs have plausibly alleged that their injuries were caused by the asserted custom, the Court need only examine the first two elements.

### a.   Continuing, Widespread, and Persistent Pattern

*Monell* liability for an unofficial custom requires that the custom "be demonstrated by a continuing, widespread, and persistent pattern of unconstitutional misconduct." *Bolderson*, 840 F.3d at 986 (citing *Ware*, 150 F.3d at 880). "Although an unconstitutional custom claim cannot be predicated on a single act, the Eighth Circuit has not determined whether some other, minimum number of incidents is required as evidence of custom." *Tirado v. City of Minneapolis*, No. 20-cv-1338 (JRT/ECW), 2021 WL 679261, at *5 (D. Minn. Feb. 22, 2021) (citations omitted). In addition to the number of incidents of misconduct, the Court must also "consider the timeframe or duration of the incidents when assessing whether the pattern was widespread." *Id.* at *6.

Plaintiffs allege that the City Defendants "have a custom or policy of failing to provide warnings and/or dispersal orders before deploying crowd control weapons, including use of chemical agents and injurious, less-lethal munitions, against protesters," as well as "a custom or policy authorizing the deployment of crowd control weapons and/or

less-lethal munitions in an unconstitutional manner." (Am. Compl. ¶¶ 118-19.) To evidence the alleged custom, Plaintiffs point to their experiences during the George Floyd protests from May 26 to May 31, 2020. Within this timeframe, Plaintiffs allege that while they and others protested peacefully, MPD officers deployed tear gas and less-lethal munitions against them without issuing warnings or dispersal orders. The Armstrongs allege that the police used unconstitutional force at the Third Precinct on May 26 and May 27; Hempfling and Clark allege that they experienced unconstitutional force at the Third Precinct on May 27 and at the Fifth Precinct on May 29; and Fraden also alleges unconstitutional uses of force at the Third Precinct on May 26 and May 27, as well as at the protest near Interstate 35W on May 31. (*Id.* ¶¶ 22-24, 28-35, 48-49, 61-65, 77-78, 81-82, 90-98.) Plaintiffs also allege that the MPD deployed chemical irritants against peaceful protesters on two occasions in 2015. (*Id.* ¶¶ 107-08.)

The City Defendants first argue that the Court must look only at the pattern painted by Plaintiffs' allegations regarding the George Floyd protests. They argue that the 2015 incidents are insufficiently similar to the conduct alleged during the George Floyd protests, and too far apart in time, to be part of the same pattern of conduct. To be sure, the Amended Complaint's allegations pertaining to these prior incidents are quite brief, totaling only two sentences. However, at the pleading stage the Court must accept the Amended Complaint's allegations as true and view those allegations in the light most favorable to Plaintiffs. *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). The Court cannot say, on a motion to dismiss based on the pleadings, that the alleged prior incidents of unconstitutional force against protesters cannot support Plaintiffs' unofficial custom claim.

The City Defendants also argue that Plaintiffs' allegations amount to only "four sporadic occasions of alleged misconduct occurring during a period of massive and dangerous civil unrest," and are therefore insufficiently numerous and temporally disparate to state a claim under *Monell*. (City Defs.' Mem. in Supp. [Doc. No. 36], at 29.) It is true that the City of Minneapolis experienced unprecedented civil unrest, including dangerous incidents of arson and vandalism, following the death of George Floyd. But the crux of the Amended Complaint is that MPD officers employed unconstitutionally excessive force against even those protesters who exercised their First Amendment rights peacefully. Plaintiffs allege several incidents of such force against numerous protesters, on multiple days in May 2020, and in different places across the city, in support of their claim that MPD officers acted pursuant to an unofficial custom. Certainly, courts have dismissed *Monell* claims based on more occasions of misconduct than alleged here, including where the misconduct was spread across a greater time period, at summary judgment. *See Tirado*, 2021 WL 679261, at *6 (examining cases). But at the pleading stage, "[e]ven if a plaintiff cannot identify the full scope of an alleged custom or policy, the key to surviving dismissal is that the 'complaint must allege facts which would support the existence of an unconstitutional policy or custom.'" *Sagehorn v. Indep. Sch. Dist. No. 728*, 122 F. Supp. 3d 842, 867 (D. Minn. 2015).

The Court finds that the Amended Complaint alleges facts which would support the existence of an unconstitutional policy or custom. Plaintiffs allege similar misconduct occurring on different days and in different places during the George Floyd protests, as well as similar incidents of unconstitutionally forceful crowd control tactics in 2015. In

*Tirado*, this Court recently found that a journalist plausibly alleged a *Monell* claim against the City Defendants, where the journalist alleged only ten instances of misconduct during the George Floyd protests. *Tirado*, 2021 WL 679261, at *6–7. As in *Tirado*, the Court finds that Plaintiffs' allegations of excessive force during the George Floyd protests—especially when considered alongside the additional allegations of misconduct in 2015—plausibly allege a continuing, widespread, and persistent pattern of unconstitutionally excessive force exercised against protesters. Although the incidents identified in the Amended Complaint are relatively small in number and are mostly condensed into a relatively short period in May 2020, at this stage the number of incidents alleged "supports the existence of an unconstitutional policy or custom," *Sagehorn*, 122 F. Supp. 3d at 867, and the facts alleged permit the reasonable inference that the time period was sufficiently long for the City Defendants to take notice of the MPD officers' alleged misconduct and change course, *see Tirado*, 2021 WL 679261, at *7 (noting that a custom is temporally persistent when the alleged time period is sufficiently long to "permit notice of the unlawful practice," and finding that the plaintiff plausibly alleged that the City Defendants had notice of MPD officers' conduct during the George Floyd protests).

### b.  Deliberate Indifference or Tacit Authorization

In order to establish *Monell* liability, a plaintiff must also prove that the municipality showed deliberate indifference to or tacitly authorized police officers' misconduct after having notice of that misconduct. *Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013). "'Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability[,]' but the complaint must also allege that the defendant 'made

a deliberate choice' to ignore alleged violations." *Tirado*, 2021 WL 679261, at *7 (first

quoting *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1216 (8th Cir. 2013), then

quoting *Johnson*, 725 F.3d at 829).

The Court finds that Plaintiffs have plausibly alleged that the City Defendants had

notice of MPD officers' alleged use of tear gas, less-lethal munitions, and kettling tactics

on peaceful protesters during the George Floyd protests. To be sure, the Amended

Complaint does not include specific allegations regarding the City Defendants' command

structure and mechanisms for transmitting information regarding the protests to municipal

policymakers. *Cf. id.* at *8 (noting that the plaintiff "explains how the City allegedly

became aware of" the alleged incidents of misconduct "through broad reporting by news

outlets, the City's own social media monitoring efforts, and direct outreach by media").

Yet the Amended Complaint does allege that the protests—and MPD officers' crowd

control tactics during the protests—were widely reported. (*See* Am. Compl. at 4 n.1, 6 n.2

(referencing a news article reporting on the scope of the protests and a YouTube video

showing MPD officers' conduct).) And the City Defendants' own characterization of the

protests as "a period of massive and dangerous civil unrest" undercuts the claim that

municipal policymakers did not have notice of the protests and the MPD's response to it.

(City Defs.' Mem. in Supp. at 29.) Although the Amended Complaint's factual allegations

regarding the City Defendants' alleged deliberate choice to ignore the MPD officers'

conduct are relatively sparse, the Court declines, at this early stage, to dismiss this lawsuit

on that basis. *See Tirado*, 2021 WL 679261, at *8 ("Although Tirado does not allege

specific facts about the City's deliberation or decision to ignore such incidents, this is likely

16

too much to ask at the pleading stage, when all that is required is a 'possible custom.'" (citing *Sagehorn*, 122 F. Supp. 3d at 867)).

The Court acknowledges that the City Defendants faced unprecedented unrest during the George Floyd protests, and that after the protests the City of Minneapolis and the MPD have attempted to reform the MPD's crowd control policies. (*See* Am. Compl. ¶¶ 123-29 (discussing amendments made to several MPD policies).) Nonetheless, the Court finds that the Amended Complaint plausibly alleges that an unofficial custom regarding the use of unconstitutional force against peaceful protesters existed at the time of the George Floyd protests, and that the custom was either tacitly authorized by municipal policymakers or policymakers were deliberately indifferent to it. Accordingly, the Court denies the City Defendants' Motion to Dismiss with respect to Plaintiffs' *Monell* claim.

### 2. Individual Capacity Claims Against Chief Arradondo

The City Defendants move to dismiss Plaintiffs' claims against Chief Arradondo in his individual capacity. Plaintiffs argue that Chief Arradondo, as the supervisor of the MPD officers who allegedly violated Plaintiffs' constitutional rights, bears individual liability for the failure to supervise and train those officers. A supervisor may be individually liable under § 1983 "if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights."[2] *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (citing *Tilson v. Forrest*

---

[2] Plaintiffs do not allege that Chief Arradondo directly participated in the MPD officers' alleged violation of Plaintiffs' constitutional rights.

17

*City Police Dep't*, 28 F.3d 802, 806 (8th Cir. 1994)). A plaintiff asserting a supervisory liability claim "must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts," which "requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Id.* (citations omitted). Because § 1983 liability "requires a causal link to, and direct responsibility for, the deprivation of rights," Plaintiffs "must allege specific facts" regarding Chief Arradondo's "personal involvement in, or direct responsibility for," the deprivation of their rights. *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)).

Plaintiffs allege that Chief Arradondo failed to train MPD officers in the constitutional use of less-lethal munitions and chemical agents. (Am. Compl. ¶ 114.) But Plaintiffs have not alleged any facts specifically related to Chief Arradondo's personal involvement in the officers' supervision and training.[3] Plaintiffs do not allege, for example, that Chief Arradondo personally trained or supervised any of the John Doe defendants. In essence, Plaintiffs' claim is that because Arradondo is the Chief of Police, he bears supervisory responsibility for all officers in the MPD, and may therefore be held individually liable for constitutional violations committed by any MPD officer. In the

---

[3] Plaintiffs point to several paragraphs of the Amended Complaint in support of their supervisory liability claim. (*See* Mem. in Opp'n to City Defs.' Mot. to Dismiss [Doc. No. 43], at 29-30.) The proffered paragraphs, however, are either conclusory or do not relate specifically to Chief Arradondo's involvement in the John Doe defendants' supervision and training. In order to survive a motion to dismiss, a complaint must do more than offer "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Court's view, this theory stretches § 1983 supervisory liability too far. *Cf. Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987) (noting that "a warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement" for purposes of an individual capacity § 1983 claim).

Because Plaintiffs have not plausibly alleged that Chief Arradondo was personally involved in the supervision and training of the MPD officers allegedly involved in the violation of Plaintiffs' rights, the Court finds that the Amended Complaint does not state a claim against Chief Arradondo in his individual capacity and dismisses the individual capacity claims without prejudice.

### C.   The State Defendants' Motion to Dismiss

Next, the Court addresses the Motion to Dismiss filed by the State Defendants. Plaintiffs seek declaratory and injunctive relief against the State Defendants, based on the State Defendants' alleged violation of Plaintiffs' constitutional rights during the George Floyd protests. The State Defendants argue that Plaintiffs' claims are barred by the Eleventh Amendment and qualified immunity, that Plaintiffs lack standing to seek prospective relief, and that Plaintiffs' individual capacity supervisory liability claims are not well-pleaded.

The Court finds that the Amended Complaint does not plausibly allege constitutional violations by MSP officers, a necessary prerequisite for Plaintiffs' official and individual capacity claims. To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint that

contains only "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," cannot survive a Rule 12(b)(6) motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). With respect to the State Defendants, the Amended Complaint contains only a few paragraphs of factual allegations. Plaintiffs allege that MSP officers were present at the May 31, 2020 protest Fraden attended near Interstate 35W. (Am. Compl. ¶ 88.) And Plaintiffs allege that "[b]oth the MPD and MSP began firing less-lethal munitions" at the protesters, that the MSP participated in kettling the protesters, and that, "[u]pon information and belief, the MSP sprayed Mr. Fraden with tear gas." (*Id.* ¶¶ 90, 93-94.) Plaintiffs' remaining allegations against the State Defendants are either conclusory or state legal conclusions, rather than factual allegations.

The Court finds that Plaintiffs' allegation, on information and belief, that the MSP was responsible for Fraden's injuries is too speculative to survive a challenge under Rule 12(b)(6). "In the post-*Twombly* and *Iqbal* era, . . . merely pleading on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim." *Kampschroer v. Anoka Cty.*, 57 F. Supp. 3d 1124, 1143 (D. Minn. 2014), *aff'd*, 840 F.3d 961 (8th Cir. 2016) (citing *Solis v. City of Fresno*, No. 1:11-cv-00053, 2012 WL 868681, at *8 (E.D. Cal. Mar. 13, 2012)). Unlike Plaintiffs' comparatively detailed allegations regarding MPD officers' use of force—which are supported by the allegations of several Plaintiffs who allegedly witnessed the MPD officers' conduct—Plaintiffs' allegation that MSP officers (as opposed to the MPD officers present) deployed tear gas and less-lethal munitions on May 31 is supported only "upon information and belief." That allegation, without more, is not sufficient to plausibly allege constitutional violations by

the MSP officers.[4] Accordingly, the Court grants the State Defendants' Motion to Dismiss without prejudice.

### D.    Defendant Kroll's Motion to Dismiss

Finally, the Court turns to Defendant Kroll's Motion to Dismiss. Plaintiffs allege that Kroll used his position as the president of the Minneapolis Police Officers Federation to "amplif[y]" his "supervisory role" and to become a de facto policymaker in the MPD. (Am. Compl. ¶ 111.) It is alleged that Kroll used his position to influence MPD policies and rank-and-file officers, shaping the unofficial customs that form the basis for Plaintiffs' *Monell* claim against the City Defendants. Kroll argues that he is a private actor, and not subject to liability under § 1983. Kroll also asserts that the First Amendment bars Plaintiffs' claims.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "[A] public employee acts under color of law when he 'exercise[s] power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Johnson v. Phillips*, 664 F.3d 232, 239–40 (8th Cir. 2011) (quoting *West*, 487 U.S. at 49). To determine whether a public employee acts

---

[4] Because the Court finds that the Amended Complaint does not plausibly allege constitutional violations by the MSP officers, the Court need not consider the additional issues raised in the State Defendants' motion, such as whether Plaintiffs' claims are barred by the Eleventh Amendment and qualified immunity.

under color of law, courts "look to see whether a sufficient nexus exists between the official's public position and the official's harmful conduct." *Ramirez-Peyro v. Holder*, 574 F.3d 893, 900 (8th Cir. 2009). This inquiry "is necessarily fact intensive." *Id.* at 901.

Plaintiffs assert that Kroll, a lieutenant in the MPD, remained an MPD employee even after becoming president of the Federation. Thus, Kroll's challenged conduct as Federation president was carried out "under color of law" if a sufficient nexus exists between Kroll's employment as a police officer and his conduct as Federation president. The Court finds that Plaintiffs have plausibly alleged such a nexus. Plaintiffs argue that Kroll's status as an MPD lieutenant made him eligible for his position in the Federation, and that several provisions of the labor agreement between the Federation and the MPD underscore the close ties between Kroll's Federation position and the MPD. (*See* Mem. in Opp'n to Kroll's Mot. to Dismiss [Doc. No. 45], at 11.) In response, Kroll points to provisions of the labor agreement that purportedly distance his Federation role from his employment by the MPD. (*See* Kroll's Reply Mem. [Doc. No. 48], at 3.) But the "nexus inquiry is necessarily fact intensive," *Ramirez-Peyro*, 574 F.3d at 901, and the Court cannot, at this juncture, weigh all the evidence pertinent to whether Kroll's conduct as Federation president was sufficiently tied to his status as a public employee. Instead, the Court finds that the facts alleged in the Amended Complaint support the conclusion that Kroll acted under color of law when influencing MPD policies and customs, even when

acting in his capacity as Federation president. Therefore, the Court finds that the Amended Complaint states a claim under § 1983 against Kroll.[5]

Kroll also argues that labor unions and their officers cannot be state actors, and that therefore his actions as Federation president are necessarily not under color of law. But neither of the cases Kroll relies on endorsed the proposition that the president of a police union is, in that capacity, always a private actor. For example, in *Montgomery v. City of Ardmore*, the Tenth Circuit noted that "[l]abor unions such as the FOP are *generally* not state actors," and then proceeded to analyze the plaintiff's § 1983 claim against the union under the theory that the union conspired with the municipal defendant to violate the plaintiff's constitutional rights. 365 F.3d 926, 942 (10th Cir. 2004) (emphasis added). That labor unions are generally not state actors does not entail that Kroll, himself a police officer, cannot act under color of law while exercising union responsibilities.

---

[5] Kroll contends that he did not have authority to set MPD policy, either as a lieutenant or as Federation president, and therefore cannot be liable under § 1983. He cites *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), for the proposition that § 1983 liability cannot be premised on "de facto" policymaking authority. It is true that the *Praprotnik* Court rejected the "vague concept of '*de facto* final policymaking authority.'" *Id.* at 131. The Court noted that, "[e]xcept perhaps as a step towards overruling *Monell* and adopting the doctrine of *respondeat superior*, ad hoc searches for officials possessing such '*de facto*' authority would serve primarily to foster needless unpredictability in the application of § 1983." *Id.* But the *Praprotnik* Court considered the concept of de facto policymaking authority in the context of a claim that, under *Monell*, the defendant municipality was liable for a constitutional violation caused by an official municipal policy. The Court's holding that a "de facto policymaker" cannot make "official municipal policy" so as to subject a municipality to § 1983 liability for that policymaker's decisions does not foreclose Plaintiffs' claim that Kroll is himself liable under § 1983 for his own conduct as an "unofficial policymaker within the MPD." (Am. Compl. ¶ 111.)

Nor does *Magee v. Trustees of the Hamline University*, on which Kroll heavily relies, foreclose Plaintiffs' theory that Kroll acted under color of law. 957 F. Supp. 2d 1047 (D. Minn. 2013), *aff'd*, 747 F.3d 532 (8th Cir. 2014). In *Magee*, this Court held that the plaintiff did not plausibly allege that the president of the St. Paul police union acted under color of law when he wrote an editorial about the plaintiff in a local newspaper and attempted to get the plaintiff fired by Hamline University. *Id.* The Court did not hold that the president of a police union cannot act under color of law. Rather, the Court reasoned that the plaintiff did not plead facts indicating that the union president wrote the editorial "in his role as a police officer, rather than as a private citizen with opinions about race issues in policing and the criminal justice system." *Id.* at 1056. Regarding the plaintiff's claim that the president attempted to get her fired, the Court reasoned that the plaintiff failed to allege that the president used his position as a police officer to influence the University, or that the president's conduct "was made possible by, or undertaken in, his position as a police officer." *Id.* at 1056–57.

By contrast, Plaintiffs claim that Kroll used his position in the Federation—which he could not hold without being a police officer—to enhance his role in the MPD, and to "actively sow[] discord between rank-and-file officers and the command structure as a means of further amplifying his policy role." (Am. Compl. ¶ 111.) Thus, unlike in *Magee*, Plaintiffs do allege that Kroll used his position as a lieutenant, coupled with his power as Federation president, to influence the MPD's customs and policies. Because Kroll's alleged conduct is the product of his position within the MPD and his influence as Federation president, Plaintiffs' claims are distinct from the claims at issue in *Magee*.

Finally, Kroll argues that Plaintiffs' claims are barred by the First Amendment. But Plaintiffs do not seek to prohibit Kroll's speech as Federation president. Rather, they claim that Kroll, by his speech and conduct, promoted the use of excessive force against protesters—including Plaintiffs—within the MPD, in violation of § 1983.

Accordingly, the Court denies Kroll's Motion to Dismiss.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Robert Kroll's Motion to Dismiss [Doc. No. 23] is **DENIED**;

2. The State Defendants' Motion to Dismiss [Doc. No. 29] is **GRANTED**, and Plaintiffs' claims against the State Defendants are dismissed **without prejudice**; and

3. The City Defendants' Motion to Dismiss [Doc. No. 33] is **GRANTED in part** and **DENIED in part**, and Plaintiffs' claims against Minneapolis Chief of Police Medaria Arradondo in his individual capacity are dismissed **without prejudice**.

**IT IS SO ORDERED.**

Dated: March 11, 2021                          s/Susan Richard Nelson
                                               SUSAN RICHARD NELSON
                                               United States District Judge