1          UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
     Nekima Levy Armstrong, on      )   File No. 20-cv-1645
4    behalf of themselves and other )          (KMM/DTS)
     similarly situated             )
5    individuals,                   )
                                    )   Saint Paul, Minnesota
6           Plaintiffs,             )   December 9, 2020
                                    )   9:35 a.m.
7    vs.                            )
                                    )   ZOOM FOR GOVERNMENT
8    City of Minneapolis, et al,    )   VIDEOCONFERENCE
                                    )
9                                   )
            Defendants.             )
10   ------------------------------------------------------------

11        BEFORE THE HONORABLE SUSAN RICHARD NELSON
             UNITED STATES DISTRICT COURT JUDGE
12                  **(MOTIONS HEARING)**

13   APPEARANCES
      For the Plaintiffs:         FISH & RICHARDSON
14                                AHMED J. DAVIS, ESQ.
                                  1000 Maine Avenue SW
15                                Suite 1000
                                  Washington, DC 20024
16
                                  FISH & RICHARDSON
17                                EXCYLYN HARDIN-SMITH, ESQ.
                                  7 Times Square
18                                20th Floor
                                  New York, New York 10036
19
                                  FISH & RICHARDSON
20                                VEENA TRIPATHI, ESQ.
                                  60 South Sixth Street
21                                Suite 3200
                                  Minneapolis, Minnesota 55402
22
                                  ACLU OF MINNESOTA
23                                ISABELLA SALOMAO NASCIMENTO,
                                  ESQ.
24                                TERESA J. NELSON, ESQ.
                                  PO Box 14720
25                                Minneapolis, Minnesota 55414

```
 1     For City of Minneapolis    MINNEAPOLIS CITY ATTORNEY'S
       Defendants and Chief       OFFICE
 2     Medaria Arrandondo:        KRISTINE R. SARFF, ASSISTANT CA
                                  SHARDA R. ENSLIN, ASSISTANT CA
 3                                HEATHER PASSE ROBERTSON,
                                  ASSISTANT CA
 4                                City Division
                                  City Hall
 5                                350 South Fifth Street
                                  Suite 210
 6                                Minneapolis, Minnesota 55415

 7     For Defendant Kroll:       KELLY & LEMMONS, P.A.
                                  JOSEPH A. KELLY, ESQ.
 8                                2360 Wycliff Street
                                  Suite 200
 9                                St. Paul, Minnesota 55114-1331

10     For Defendants             MINNESOTA ATTORNEY GENERAL'S
       Harrington and Langer:     OFFICE
11                                JOSEPH D. WEINER, Assistant AG
                                  Bremer Tower, Suite 1100
12                                445 Minnesota Street
                                  St. Paul, Minnesota 55101-2128
13
       Court Reporter:           CARLA R. BEBAULT, RMR, CRR, FCRR
14                               316 North Robert Street
                                 Suite 146 U.S. Courthouse
15                               Saint Paul, Minnesota 55101

16

17

18         Proceedings recorded by mechanical stenography;
       transcript produced by computer.
19

20

21

22

23

24

25
```

1          **P R O C E E D I N G S**

2    **VIA ZOOM FOR GOVERNMENT VIDEO TELECONFERENCE**

3

4          THE COURT:  We are here this morning in the matter

5    of Nekima Levy Armstrong, et al, on behalf of themselves and

6    others similarly situated, versus the City of Minneapolis,

7    et al.  This is civil file number 20-1645.  Let's take

8    appearances and we'll begin with the plaintiffs, please.

9          MR. DAVIS:  Good morning, Your Honor.  My name is

10   Ahmed J. Davis.  I'm from the law firm of Fish & Richardson.

11   I'm in Washington, DC, and I'm here on behalf of the

12   plaintiffs.  With me from my law firm is my colleague

13   Excylyn Hardin-Smith who will also be sharing in the

14   argument with me today, and my colleague Veena Tripathi.

15   Also on behalf of plaintiffs on the Zoom but who will not be

16   arguing are Teresa Nelson and Isabella Nascimento on behalf

17   of the ACLU.

18         THE COURT:  Very good.  Thank you and good

19   morning.

20            Let's turn then to counsel for Lieutenant Kroll.

21         MR. KELLY:  Good morning, Your Honor.  Joseph

22   Kelly, K-e-l-l-y, on behalf of Robert Kroll.

23         THE COURT:  Very good.  And counsel for the City

24   of Minneapolis and Chief of Police Arradondo.

25         MS. SARFF:  Good morning, Your Honor.  This is

1    Kristin Sarff with the Minneapolis City Attorney's Office.

2    I will be arguing today.  My colleagues Sharda Enslin and

3    Heather Robertson are also appearing.

4              THE COURT:  Very good.  Thank you.

5              And for the State defendants, please.

6              MR. WEINER:  Good morning, Your Honor.  Joe

7    Weiner, Assistant Attorney General, on behalf of

8    Commissioner John Harrington and Colonel Matt Langer, the

9    State defendants.

10             THE COURT:  Very good.  Now, we're here to

11   consider three motions.  We have a motion to dismiss filed

12   by Lieutenant Robert Kroll; a motion to dismiss the amended

13   complaint filed by the State defendants; and by the State

14   defendants I do mean Public Safety Commissioner John

15   Harrington and Minnesota State Patrol Colonel Matthew

16   Langer.  And finally a motion to dismiss filed by the

17   Minneapolis defendants, that is the City of Minneapolis and

18   the chief of police, Chief of Police Arradondo.

19             I don't know if the parties discussed the most

20   logical order of argument.  I think I would recommend that

21   we take the last filed motion first, that is the motion to

22   dismiss filed by the Minneapolis defendants, and then the

23   motion to dismiss filed by Lieutenant Kroll; and finally the

24   motion to dismiss filed by the State defendants, unless

25   there's an objection to proceeding in that fashion.

1          MR. DAVIS:  No objection from -- on behalf of the

2     plaintiffs, Your Honor.  If we go in that order, the first

3     one as to the City is the argument that's going to be

4     handled by Ms. Hardin-Smith.

5          THE COURT:  Very good.  All right.  Then we will

6     do that and I will first entertain the motion to dismiss

7     filed by the Minneapolis defendants.  I presume that's you,

8     Ms. Sarff.

9          MS. SARFF:  Yes, Your Honor.  Thank you.

10          Your Honor, following the death of George Floyd

11     there were unprecedented protests and civil unrest in the

12     City of Minneapolis.  Hundreds, if not thousands, of people

13     rightfully took to the streets to protest what they viewed

14     to be excessive force by a police officer, and perhaps in

15     the history of excessive force by a police officer.

16          During the unprecedented civil unrest, the

17     plaintiffs concede that there was vandalism against

18     property.  There was property destruction.  There was

19     looting of businesses.  There was a Third Precinct that was

20     burned to the ground.  And there was, of course, force used

21     against police officers.  And this was, as one other

22     defendant identified, the largest riot that the City of

23     Minneapolis had ever experienced.

24          And while that civil unrest was unprecedented, we

25     do not individually challenge each of the named plaintiffs'

1    ability to seek relief against the individual Doe

2    defendants.  What we do challenge, however, Your Honor, is

3    the unprecedented request to hold the City of Minneapolis

4    liable for a period that the plaintiffs describe as a

5    three-to-five-day period.  By law, as a matter of law on the

6    motion to dismiss, with the allegations taken in all

7    inferences in favor of the plaintiffs, that is not a --

8    whatever amount of force was used during that time period

9    cannot be considered continuing, widespread and persistent

10   such that it can make out a custom or any of the other

11   *Monell* or supervisory liability claims against the City

12   defendants.

13          We have identified -- the most on point case law

14   regarding this topic is the *Burbridge* case.  That is a

15   protest case that arose out of the *Stockley* decision in

16   which an officer was found not guilty in a fatal shooting.

17   Out of three days of protests with multiple incidences of

18   pepper spraying, the court in that case decided that that

19   time period was simply too close in time to the

20   plaintiffs -- which occurred, of course, during that

21   three-day period -- to be considered widespread, continuing

22   and persistent.

23          And that is consistent with the standard of law

24   announced by the United States Supreme Court that the use of

25   force or the pattern of constitutional misconduct has to be

1    so longstanding as to be considered permanent and well

2    settled.  There are no cases cited by the plaintiffs that

3    would allow this Court or would persuade the Court to find

4    that a three-to-five-day period, punctuated by two days of

5    no alleged misconduct, could qualify as a pattern of

6    unconstitutional conduct.

7            For the same reasons -- and the plaintiffs stand

8    essentially just on that three-to-five-day period.  They of

9    course do identify two isolated incidents in 2015.  Notably,

10   that -- those allegations do not -- do not involve instances

11   of less lethal projectiles and accordingly they cannot be

12   considered part of a pattern as to that type of use of

13   force.

14           They do allege instances of use of chemical

15   irritants.  However, given the five-year distance between

16   those allegations and the three-to-five-day period in 2020,

17   that cannot be considered sufficient to essentially make up

18   for a five-year gap.  It is too distant in time to be

19   considered a pattern.

20           THE COURT:  Ms. Sarff, let me just interrupt you

21   one moment.  This may be a persuasive argument on summary

22   judgment, but don't we need a record from which to determine

23   whether a pattern exists or not?  Aren't we just considering

24   whether the plaintiffs have plausibly alleged that?

25           MS. SARFF:  Your Honor, I have not seen any case

1    cited by -- in my research or cited by the plaintiffs that

2    suggests that the -- that the legal determination of whether

3    or not a pattern has been plausibly alleged as continuing,

4    persistent or widespread, is anything but a legal

5    consideration.  What the plaintiffs allege, at most, is that

6    there was a three-to-five-day period; or even if you assume

7    it's May 26th and May 31st, that is an isolated period of

8    time.

9             Our position is regardless of how many instances

10   of force are identified within that time period, it is

11   insufficient to be considered a custom.

12            The plaintiffs affirmatively plead that the

13   purported class is only for those protests occurring or only

14   for those individuals injured during that particular

15   timeframe, May 26th to May 31st.  And so as a legal matter,

16   Your Honor has the sufficient pleadings in front of you to

17   determine whether or not a three-to-five-day period can be

18   considered continuing, persistent and widespread.

19            THE COURT:  I suspect what we'll hear in response

20   is that although it is a legal determination ultimately for

21   the Court to make, it's based on a factual record, is it

22   not?  And I think what you're arguing is that every one of

23   those facts would have to be included in the complaint for

24   it to be plausibly alleged.  Am I incorrect in that?

25            MS. SARFF:  No, Your Honor.  Our position is that

1      even if discovery were to occur and there were more

2      allegations of improper uses of chemical irritants or less

3      lethal projectiles between May 26th and May 31st, it still

4      wouldn't be sufficient to establish a custom claim against

5      the City of Minneapolis, and in particular, with respect to

6      these six named plaintiffs.

7              And the reason for that is because the U.S.

8      Supreme Court has held that contemporaneous or subsequent

9      misconduct cannot set forth a sufficient notice to a

10     municipality such that it could have conformed in time to

11     remediate the plaintiff's injury.  And so -- and so although

12     we have a purported class here, Your Honor, we do need to

13     look at the individual claims of the plaintiffs.

14             So, for example -- and that's something that we

15     don't see happening in the plaintiffs' opposition to our --

16     to the City's motion.  But you have, for example, the

17     Armstrongs alleging that they were injured, I believe, on

18     May 28th.  Well, Your Honor would have to conclude that a

19     two-day period of allegations of misuse of either chemical

20     irritants or projectiles would be sufficient to put the City

21     on notice that it needed to act before those particular

22     plaintiffs were injured.  And our position is that even if

23     they identify additional incidences of unlawful uses of

24     force or allegations of unlawful uses of force, that's not

25     sufficient for the City to have been put on notice such that

1     it should have acted within time.

2          And within the context of a motion to dismiss,

3     Your Honor is of course guided by U.S. Supreme Court

4     precedent asking you to use common sense in terms of whether

5     or not deliberate indifference could have occurred or notice

6     could have occurred.  And although the plaintiffs indicate

7     that there was social media and traditional methods of

8     reporting, there are no allegations in the complaint that

9     the City of Minneapolis was on notice of these particular

10    allegations.  And even if they had been, given the dramatic

11    state of civil unrest that warranted an emergency time -- a

12    curfew in an emergency order from the Governor, it cannot be

13    held that the City of Minneapolis would have been

14    deliberately indifferent to unlawful uses -- alleged

15    unlawful uses of force within a mere matter of days.

16         And that's particularly important given the fact

17    that the plaintiffs concede in their complaint that the City

18    of Minneapolis did in fact take remedial actions.  That

19    there were voluntary policy changes made following these

20    protests, which means that this is not an incident -- an

21    instance where the City of Minneapolis did not consider the

22    events that took place over the course of the protests.

23         This is a case where plaintiffs are alleging

24    three-to-five-days' notice and inability for the City of

25    Minneapolis to come in and rectify that within mere matters

1    of days, given the massive civil unrest that's conceded by

2    the plaintiffs, and then subsequently took action to correct

3    the very issues that the plaintiffs are alleging, which is

4    that a higher level authority needed to be giving permission

5    or orders to authorize the particular uses of force that the

6    plaintiffs challenge.

7           So that has already been done by the City of

8    Minneapolis.  That's in their amended complaint.  That's in

9    their amended complaint.  And the plaintiffs have not

10   identified any case that would disrupt settled U.S. Supreme

11   Court precedent that said it has to be so permanent and well

12   settled as to have the force and effect of law that three to

13   five days could qualify for that.  And that's a legal

14   determination that Your Honor can make at this point.

15          In terms of the training, all I would say on that

16   is that if you look through the amended complaint -- and

17   it's an amended complaint which means the plaintiffs have

18   already taken a second attempt to plead a plausible claim --

19   the training argument, there's no deficiency identified with

20   the training in any regard, and that's dispositive.  The

21   controlling case law identifies that on a motion to dismiss

22   or in the pleading requirements, that the plaintiffs have to

23   identify a specific pleading deficiency.  And here that

24   doesn't exist.

25          There's no allegation, for example, that officers

1    are being trained about how far away someone is supposed to

2    be when they are using a chemical irritant, or how they are

3    supposed to aim the chemical irritant, or anything along

4    that line.  There's simply a generic allegation that there's

5    not training or a generic allegation that the training is

6    insufficient.  And that's a dispositive issue because we're

7    entitled to be on notice about what their allegations are as

8    to the training deficiencies, and there's nothing in the

9    complaint.

10           And then finally with respect to the policy

11   claims, all I would point out is at this point they concede

12   that all of the City's policies with respect to chemical

13   munitions, chemical irritants, and less lethal munitions are

14   constitutional.  They allege only that two ordinances

15   relating to the blockage of pedestrian and vehicle

16   passageways are unconstitutional in the way that they are

17   applied.

18           But the plaintiffs do not allege that any of

19   the -- any of the named plaintiffs were targeted because of

20   these ordinances.  In other words, there is no causal

21   connection between the purported policy, the ordinance

22   violations that they identify, or should I say the

23   enforcement of the ordinances, and the plaintiffs' actual

24   injuries; and therefore, that's not a policy violation.

25           The last thing just going back quickly to the

1       custom claims, because of course in the Eighth Circuit

2       precedent of *Ware versus Jackson County*, which says that

3       there has to be not only -- it's not sufficient to simply

4       allege allegations of unlawful force; they have to be

5       widespread, continuing, persistent.  There has to be notice,

6       there has to be deliberate indifference, and then there has

7       to be causation.

8               What I would point to Your Honor is beyond the

9       *Burbridge* case, which is on point on a motion to dismiss,

10      that the plaintiffs cite to a case of *Aldridge versus City*

11      *of St. Louis* as setting forth the standard for a custom

12      claim.  And in that case, that is again another case

13      involving protests and allegations that officers, not the

14      Minneapolis Police Department, but other officers used

15      chemical agents in an unlawful manner.

16              In that case, that was an instance where the

17      plaintiffs pled other instances of unlawful uses of

18      munitions multiple times.  Three years before, two years

19      before, and in the same year -- and then in the exact same

20      year as the alleged incidences.  And there are no cases

21      identifying a pattern based upon the timeframe that they

22      have alleged.  There are no cases identifying a custom or a

23      pattern based upon allegations of use of force in which the

24      plaintiffs' allegations are absolutely contemporaneous with

25      the other allegations.

14

1              And accordingly, we ask that you dismiss these --

2       dismiss all of the claims against Chief Arradondo and the

3       City of Minneapolis because as a matter of law, the

4       timeframe, the time period, both because of its duration and

5       its contemporaneous nature with the plaintiffs' allegations,

6       cannot satisfy a *Monell* supervisory liability claim.

7              And I appreciate the opportunity to respond, but I

8       understand there are a lot of people for you to manage here,

9       Your Honor.  So thank you.

10             THE COURT:  Very good.

11             Who wishes to be heard?

12             MS. HARDIN-SMITH:  Good morning, Your Honor.  My

13      name is Exycyln Hardin-Smith.  I will be responding to

14      Ms. Sarff's argument on behalf of the City defendants, and

15      of course I am representing the plaintiffs.

16             THE COURT:  Very good.

17             MS. HARDIN-SMITH:  Thank you, Your Honor.

18             So at the outset, you know, I do want to take a

19      moment to of course respond to Ms. Sarff's specific

20      allegations, but I want to sort of reframe the argument, in

21      a way, taking it away from the argument that we heard from

22      the City defendants.

23             The City defendants have given us a lot of

24      justifications and rationalizations for the conduct that

25      Minneapolis Police Department officers displayed, this

1     excessive force.  And I think it's important that we frame

2     that as this is just unconstitutional policing.  Like, the

3     end of story.  Like, it's unconstitutional policing.  And

4     the fact that the City defendants are trying to split hairs

5     by talking about this timeframe and whether they had notice

6     or not is just -- it takes away from the issue that there's

7     no excuse for unconstitutional policing at any point in

8     time.  It's not justified simply because this is an

9     unprecedented event.  It's not justified simply because

10    we're in a period of extreme civil unrest, as the City

11    defendants qualify it.  Unconstitutional policing is just

12    simply inexcusable and we cannot make justifications for it

13    the way the City defendants have tried to do here.

14          So turning to the City defendants' specific

15    arguments, in terms of our *Monell* claim regarding an

16    unlawful custom and policy being so pervasive and persistent

17    as to become law, we disagree, of course, with the

18    defendants' characterizations of what happened here.  If you

19    look at the 2020 incidents just in and of themselves, within

20    the City defendants' briefing they try to reduce what

21    happened in the week following George Floyd's murder to four

22    occasions of misconduct by focusing in on the specific days

23    on which there were allegations of excessive force by -- as

24    pled for our named plaintiffs.

25          However, what we're talking about here are not

1    simply four occasions.  We're talking about multiple

2    occasions where each time an officer made a decision to fire

3    a canister of tear gas or to fire a round of less lethal

4    munitions at a protester who was peacefully assembled

5    exercising their First Amendment rights, each one of those

6    is a separate occasion upon which the City defendants had a

7    choice and an option not to use excessive force but they

8    chose to do so.  So we take issue with that at first.

9         And then secondly, we're talking about five named

10   plaintiffs here who are representative of a putative class

11   of plaintiff.  So of course we only pled with specificity to

12   these specific allegations that happened to our specific

13   named plaintiffs, but we of course also pled that there was

14   widespread use of excessive force by the Minneapolis Police

15   Department throughout the timeframe between May 26th and May

16   31st.  So we want to make sure that we do not reduce the

17   arguments simply to just what our named plaintiffs have pled

18   specifically.

19        The City defendants also make arguments that we

20   are trying to create a custom or policy strictly based on

21   the number of people that were involved in these incidents

22   pled for the 2020 protests.  However, although that of

23   course plays a factor, that does not inform fully our custom

24   and policy argument.  What it does is it goes to the notice

25   aspect that is required in proving an unlawful custom or

1    policy argument.

2              The City defendants want to argue that somehow

3    they were not on notice of the excessive force demonstrated

4    by MPD officers daily from May 26th through May 31st.

5    Certainly, and as the City defendants have acknowledged, we

6    live in a 24-hour news cycle now.  News coverage is on 24

7    hours a day, and of course you have social media outlets

8    where you can witness and find news live all the time.  And

9    certainly in this week following the -- following George

10   Floyd's murder, Minneapolis was front and center on a

11   national stage.

12             So the fact that somehow the City defendants are

13   arguing that they were not on notice of this excessive force

14   when the rest of the world clearly was is just implausible,

15   Your Honor.

16             And I think further what the City defendants are

17   trying to claim here is that somehow the timeframe of three

18   to five days was too short of a time period for the City

19   defendants to, one, be put on notice; and then, two, be able

20   to act and intervene.  And we also find that doesn't mesh

21   with the facts as pled in our amended complaint.

22             First, of course, as I mentioned, the 24 hours

23   news cycle, the fact that the rest of the world surely saw

24   the excessive force that the MDP officers were demonstrating

25   against peaceful protesters.  But also if each day, as pled

1    in our complaint, starts with May 26th, each day the

2    protestors went home.  The protestors were not out

3    protesting 24, 48, 96 hours in a row.  Each day they went

4    home.  Each day the City defendants had an option and a

5    decision to make about how they were going to react to the

6    protestors the following day.  And each day, for at least

7    for the allegations that we have pled here, each day the

8    City defendants made the choice to use excessive force

9    against plaintiffs.  Peaceful protestors.  They had an

10   opportunity to make that decision and to intervene and to

11   change course and they did not do so.

12           This is further evidenced by the fact that, as

13   pled in our complaint, lots of -- in quite a few scenarios

14   the plaintiffs often went back to the same scene that they

15   were protesting at the prior day, and many times they came

16   back and they noticed when they arrived on a subsequent day

17   that there were barricades directed around the precincts.

18   There were now police perched on top of the roof of the

19   precincts.

20           So the City defendants had enough notice to act

21   and intervene by erecting barricades around precincts, by

22   perching officers on top of the precincts to do what we

23   assume they thought was protecting the precinct, but they

24   didn't have an opportunity to intervene and stop police

25   officers from using excessive force?  Those two facts just

1    do not jive, Your Honor.  If you have an opportunity to

2    intervene and erect barricades and to perch officers on the

3    roof of precincts, you similarly have an opportunity to

4    correct your officers and to tell them not to use excessive

5    force against protestors.

6         And what this highlights for us, Your Honor, is

7    the fact that the training was sufficient within the MPD.

8    And that goes into, of course, another angle from a *Monell*

9    liability, but if the training had been sufficient, the

10   officers of the MPD would have been able to regroup quickly

11   and get an instruction out to the officers to not use

12   excessive force, to follow MPD guidelines.  The fact that

13   that was unable to happen just is a further demonstration of

14   the fact that the training is sufficient.

15        Now, if we move on to talking a bit more about how

16   the training was sufficient, this is seen as pled in our

17   complaint, Your Honor, in the actual MPD policies.  MPD

18   policies, there were a number that governs things that if --

19   I think if had been followed, maybe we'd be in a different

20   position than we are currently.  There were a number of MPD

21   policies that stated that chemical irritants and less lethal

22   munitions should only be used if needed to protect oneself.

23   Should not be used to interfere with lawful protests or

24   demonstrations, and should not be used on individuals

25   demonstrating passive resistance.

1             Nothing that is pled in our complaint demonstrates

2      remotely that our plaintiffs were acting even with passive

3      resistance.  None of our plaintiffs did fail to comply with

4      a disbursal order, because in most cases there was none.  In

5      the one case where there was a disbursal order issued, in

6      the case of Ms. Clark and Ms. Hempfling, they immediately

7      began to disburse, but were not given an opportunity to do

8      so before they were kettled by police officers and fired

9      upon with less lethal munitions and chemical irritants.

10            So there's no fact here, Your Honor, that would

11     give -- that would give the MPD grounds to even use chemical

12     irritants or less lethal munitions according to their own

13     policies.  And the fact that those policies were not

14     followed demonstrates either a lack of training as to those

15     policies or that somehow the training is insufficient.

16     That's the most logical inference if you have policies and

17     you directly go against them and don't follow them.

18            Also, as noted in the Supreme Court cases of

19     *Hanten*, there is just also an option for single incident

20     liability.  So it doesn't even require this full-blown

21     policy or custom or notice.  The fact is that if you are

22     going to arm MPD officers with less lethal munitions and

23     chemical irritants and put them in situations where they can

24     potentially use that on crowds, you have to give them

25     appropriate guidance so that they use those weapons within

1    constitutional limits.

2              It's just so obvious -- and that's the standard,

3    Your Honor, is that the need for training is so obvious that

4    there's no notice required.  And that is the case here, Your

5    Honor.  You cannot arm MPD officers and put them out with

6    crowds of protestors and not tell them -- not inform them of

7    constitutional rights of protesters so those are not

8    violated.  And that's exactly what we have demonstrated here

9    based on the allegations we have pled in our complaint.

10             But if we move on to talking about City

11   ordinances, the City ordinances are unconstitutional on

12   their faces as we have alleged, just because they don't give

13   citizens notice of what qualifies as unlawful conduct.  The

14   two ordinances that we pled, 466.240 and 385.65, both deal

15   with vehicular and pedestrian traffic and blocking that.

16   And so there's just no clear point in the ordinance language

17   that makes clear what qualifies, like when the line is

18   crossed as to when a plaintiff or a citizen will be in

19   danger of violating those laws.

20             So I do want to take a quick double back and talk

21   a bit about some of the more specific allegations that the

22   City defendants have made regarding some of the case law

23   with regards to *Monell* liability.  So we understand, of

24   course, the cases are recited, and particularly the

25   *Burbridge* case that references the three-day period

1    targeting a hundred people, but what we're talking about

2    here is -- is just -- the case law just does not match what

3    we're discussing here in terms of the incidents that

4    happened in 2020.  We're not talking about isolated

5    incidents where the defendants had no notice of the conduct

6    of MPD officers.  We're not talking about incidents that --

7    that affected a small number of people so it's possible the

8    City defendants could just be unaware.  There's no plausible

9    argument here that the City defendants were unaware of what

10   was happening in the 2020 protests.

11          And if you look to the 2015 incidents that we pled

12   in our complaint, those -- the argument that the City

13   defendants are trying to make between the two separate

14   years, 2015 to 2020, also doesn't quite jive with the

15   specific case law that's referenced.  Understandably, a

16   five-year difference is something to note.  However, the

17   fact pattern of the 2015 incidents and the 2020 incidents

18   are the same.

19          What we are talking about is an MPD officer kills

20   an unarmed person, and in all of these scenarios it's an

21   unarmed black person, and then it gets news coverage.  It

22   sparks protests, and the MPD meets those protestors by

23   firing chemical irritants or less lethal munitions at them.

24   That's what happened at the two incidents pled in 2015 when

25   Tony Robinson and Jamar Clark were killed, and that's what

1          happened in 2020 when George Floyd was killed.

2                    So -- and the facts that the City defendants are

3          trying to distinguish somehow between the use of chemical

4          irritants in 2015 versus the use of both chemical irritants

5          and less lethal munitions in 2020 is a distinction without a

6          difference.  These are both considered, both chemical

7          irritants and less lethal munitions, are crowd-control

8          tactics used by the MPD, used by law enforcement.  They're

9          simply -- they go into the same category and there's just no

10         argument that a use of chemical irritants versus a use of

11         both chemical irritants and less lethal munitions is somehow

12         distinctive.  The fact patterns are the same and that is the

13         issue that we're dealing with.

14                   And, you know, potentially and what our argument

15         is, Your Honor, is that discovery of what has happened

16         between the years of 2015 and 2020 may further flesh out

17         additional incidents and additional fact patterns that

18         demonstrate that this has happened more often than just

19         between 2015 and 2020.

20                   So those are our arguments as to dispute the fact

21         that the five-year gap somehow plays some significant role

22         here.  The fact patterns are the same, or substantially

23         similar, unlike what we are talking about in the case law

24         cited by defendants.

25                   And I also want to make a point to distinguish

1    this concept that the 2020 incidents were contemporaneous

2    and happened all at the same time by reemphasizing the fact

3    that each day protestors went home.  These were not all

4    happening at the exact same time.  We're not pleading that

5    on one day the Minneapolis Police Department went around and

6    targeted a thousand people with tear gas and less lethal

7    munitions.  We're talking about a period of six days where

8    there was full-blown news coverage of what was happening on

9    a daily basis and the City defendants chose not to act.

10          We also feel that based on the deficiency and the

11   training as evidenced -- I'm sorry -- of the sufficiency of

12   training as evidenced by the MPD officers' failure to follow

13   their own MPD guidelines, that further contributes to

14   supervisory liability of Chief Arradondo.  The fact that we

15   have not pled that Chief Arradondo was on the scene and gave

16   a specific order is irrelevant to supervisory liability.

17   The issue here is that there was a failure to train.  And

18   the fact that the MPD officers did not follow their own

19   training is a clear -- is a clear inference that Chief

20   Arradondo somehow failed to train his officers adequately

21   and therefore is liable under a theory of supervisory

22   liability.

23          Thank you, Your Honor.

24          THE COURT:  Let me ask you about that last point.

25   Are you suggesting that that would lead to individual

```
 1    capacity liability on the part of Chief Arradondo, or is
 2    that in support of your argument that there's official
 3    capacity liability?
 4              MS. HARDIN-SMITH:  Thank you, Your Honor.  That is
 5    our basis for individual liability for Chief Arradondo.
 6              I'm sorry, go ahead.
 7              THE COURT:  No, you go ahead and finish.
 8              MS. HARDIN-SMITH:  Just to sum it up, the fact
 9    that Chief Arradondo failed to train his inferior officers,
10    the MPD officers, subjects him to individual liability.
11              THE COURT:  Now, can you cite to me a case to that
12    effect?  Typically individual liability requires actual
13    acts, but sort of hooking it into Monell liability typically
14    doesn't work.  Tell me about a case in the Eighth Circuit in
15    which sort of a general allegation of the chief of police
16    failed to train provided a basis for individual capacity
17    liability.
18              MS. HARDIN-SMITH:  Sure, Your Honor.  If you look
19    at the McGuire v. Cooper case, that demonstrates that 1983
20    liability, under a theory of supervisory liability, can
21    create liability for a chief of police such as Chief
22    Arradondo.
23              THE COURT:  But is that a case in which it was
24    supervisory liability in the way that you're arguing it;
25    that is, generally failing to train; or is that a supervisor
```

1    of an individual police officer who injured somebody?

2           MS. HARDIN-SMITH:  So that is based on a theory

3    that the chief, the oldest supervising officer, put

4    officers in a situ -- created a dangerous situation where

5    the officers were not trained to sufficiently deal with the

6    situation, and basically created a danger for the officers

7    and their interactions with citizens, and in our case the

8    plaintiffs.

9           THE COURT:  But what are the facts of *McGuire*?

10          MS. HARDIN-SMITH:  So the facts of *McGuire,* as I

11   understand them, relate to -- it does qualify for a specific

12   supervisor.  It is not limited strictly to just a failure to

13   give an order or just failure to train.  It's a matter of

14   the officer -- of the chief, the supervising officer,

15   creating the dangerous situation.  So just the ultimate

16   failure to train his inferior officers that created that

17   supervisory liability.

18          THE COURT:  Okay.  I'm worried that we're -- that

19   there really isn't good authority that would hold Chief

20   Arradondo individually liable in his individual capacity

21   based simply on an allegation that his police force wasn't

22   adequately trained.  That sounds like official capacity

23   liability to me.  But in any event, I will take a good look

24   at the law you cite.

25          I'll go back to Ms. Sarff now.

1           MS. HARDIN-SMITH:  Thank you, Your Honor.

2           MS. SARFF:  Your Honor, one of the things I want

3     to stress is that when we bring a motion to dismiss we're

4     doing so based upon the four corners of the amended

5     complaint that is in front of us.  And if you -- just

6     starting where you left off, Your Honor, there are no

7     allegations in the complaint that relate to Chief Arradondo

8     other than official capacity claims.  They all relate to him

9     being the chief of police.  They all relate to his position

10    of authority.  They don't relate to his direct involvement

11    or any actions that he undertook that would have led to

12    these constitutional violations.

13          Additionally, we want the plaintiffs to be

14    constrained to what's in their amended complaint.  For

15    example, what you did not hear the plaintiffs say is that

16    there's any cases that -- that allows deliberate

17    indifference to be found upon mere delay in action.  What

18    you heard the plaintiffs say is that it's inconceivable to

19    them that Chief Arradondo or the City wouldn't have acted

20    within a matter of days because the protestors went home at

21    night.

22          That is nowhere in the complaint and it defies

23    absolute 24-hour news coverage to say the protestors went

24    home at night when the Third Precinct burned in the middle

25    of the night.  If you were here in Minneapolis, or

1    Minnesota, you know that those protests were not 9:00 to

2    5:00 occasions.  They were round the clock.  That's why the

3    Governor of Minnesota instituted a nighttime curfew.  There

4    were no instances during this period of massive civil unrest

5    where there was time off.

6          And their suggestions, which are not in the

7    complaint, that there was time to put up barricades, were in

8    fact efforts to create distance between the rioters and the

9    protestors and the police officers.  That was in fact action

10   attempting to deescalate or to remove opportunities or the

11   necessity to use force by creating distance.  You do not see

12   anything in the complaint that says that there was time in

13   the three-to-five-day period, let alone in the two days

14   before the first named plaintiff alleges they were harmed,

15   or the first three days where the next three and four named

16   plaintiffs alleges they were harmed.  That doesn't exist.

17         There are no cases, no cases, cited by the

18   plaintiff that disrupts U.S. Supreme Court precedent that

19   has to be so permanent and well settled as to create a

20   custom.  And there are no allegations indicating that Chief

21   Arradondo or the City of Minneapolis knew that there was

22   widespread constitutional violations.  To be clear, the fact

23   that force was used is not the equivalent of a

24   constitutional violation.

25         And what I will say is almost everything that the

1    plaintiff said during the first five minutes of their

2    presentation to this Court are allegations against the

3    individual Doe defendants.  We do not dispute that the named

4    plaintiffs can pursue claims against the named or the

5    unnamed Does.  That they have plausibly pled that they were

6    peacefully protesting and force was used against them

7    unlawfully.  That has every right to come in front of Your

8    Honor and to be pursued by discovery.

9         But they are asking to hold the City liable for

10   the individual conduct of officers based upon mere days

11   during massive civil unrest when absolutely -- when

12   basically nobody was going home at night, which necessitated

13   a nighttime curfew.  And that is not sufficient to create

14   liability for the City of Minneapolis.

15        And when the plaintiffs say that there's no

16   distinction between chemical irritants and less lethal

17   munitions, that also defies Eighth Circuit and U.S. Supreme

18   Court precedent which says that they have to allege similar

19   instances, similar uses of force, in order to make out a

20   custom.  There are no allegations of an unlawful use of less

21   legal projectiles until May 26th.  That's the first time

22   that the plaintiff alleges it.  That's on the same day that

23   they are alleging that they are being subjected to chemical

24   irritants, which means it's contemporaneous.

25        There are four occasions alleged in the complaint.

1   They are contemporaneous with one another.  And even if you

2   consider the purported class, even if you consider other

3   protestors, those are also mere contemporaneous.  As a

4   matter of law, the City of Minneapolis was not on notice.

5   As a matter of law, the City of Minneapolis was not

6   deliberately indifferent.

7           And it's important to note that the plaintiffs are

8   asking you to conclude that notice and deliberate

9   indifference are the same thing when they are not.  A

10  defendant can be on notice of unlawful conduct and not be

11  deliberately indifferent to it.  It may be that there's a

12  delay in reaction, which this District has said does not

13  amount to deliberate indifference.

14          And you will note that the plaintiffs do not

15  dispute that the City of Minneapolis took the very

16  corrective action that they wanted it to take.  And so

17  there's no way, based upon the four corners of the

18  complaint, what they have alleged, not what they've just

19  said in a presentation to the Court, but what's in the

20  complaint that we have notice of that we're able to present

21  to the Court, none of that indicates deliberate

22  indifference, none of it indicates notice, and none of it

23  indicates a custom that was sufficiently long to be

24  considered continuing, widespread and persistent as a matter

25  of law.

1                    And I would also point out, Your Honor, that when

2          plaintiffs attempt to go to single incident liability, that

3          is an implicit recognition that there's not a pattern of

4          misconduct that the City would have been on notice of.  But

5          in order to find it was so obvious that harm would have

6          happened if more training wasn't provided, they have to

7          point to some sort of incidences.  They have to provide some

8          factual allegation that it would have been so obvious to the

9          City.  But they don't point to even a single incident of

10         unlawful use of a projectile before this three-to-five-day

11         period, and they don't allege anything but a five-year gap

12         in the purportedly unlawful use of chemical irritants.

13                    And I say "purportedly unlawful" because, again,

14         that's a presentation that they have made in briefing, it's

15         a presentation that they have made to you here now, but it's

16         not in the complaint.  In the amended complaint they simply

17         allege that there were two incidences five years ago of

18         officers using chemical munitions.  That does not equate to

19         unconstitutional conduct.  It simply doesn't.

20                    And so, Your Honor, if you look back to the

21         complaint itself, as a matter of law you can see that there

22         are not sufficient allegations against Chief Arradondo

23         individually.  There are not sufficient allegations

24         regarding a specific training deficiency.  There is no

25         causal connection between the ordinances they challenge and

1     a use which relate to blocking pedestrian or vehicle

2     traffic.  And there are allegations that there have been

3     chemical munitions or less lethal munitions used against

4     them, and there is no indication otherwise that there's any

5     basis to hold the City of Minneapolis liable.

6            We fully understand that the Does should be

7     challenged for their conduct.  That the plaintiffs can

8     challenge that conduct; but they have not, quote, unquote,

9     drawn the City of Minneapolis into this lawsuit based upon

10    their allegations.

11           Thank you, Your Honor.

12           THE COURT:  Okay.  Let's move ahead then to the

13    motion to dismiss filed by Lieutenant Robert Kroll, please.

14           MR. KELLY:  Good morning, Your Honor.  Joseph

15    Kelly on behalf of Robert Kroll, and thank you for arranging

16    this over Zoom under the current conditions.

17           Defendant Kroll joins the City of Minneapolis in

18    its position that our motion to dismiss does not foreclose

19    the plaintiffs' ability to hold accountable the officers

20    that used force if found to be unlawful against the named

21    plaintiffs.  However, just because force used by another is

22    alleged by the plaintiffs, it does not create liability

23    against the union president that is the exclusive

24    representative of those actors.

25           Plaintiffs acknowledge in their memorandum that

1    their suit against Robert Kroll is solely because of his

2    position as the president of the Police Officers Federation

3    of Minneapolis.  As the -- when Kroll acts as the president

4    of the Police Officers Federation of Minneapolis, he is

5    acting as a private citizen as a matter of law.

6            As this Court has found, the Eighth Circuit has

7    found and the Second Circuit has found, as cited in my

8    memoranda, when acting in the capacity as a union president

9    or union official, Robert Kroll is not a state actor subject

10   to 1983 liability.

11           Most on point in the Second District was the *Kern*

12   *versus City of Rochester* case.  In that case it was a union

13   firefighter president, the firefighters union president, who

14   is also a lieutenant in the City of Rochester's fire

15   department, who was a full-time employee of the City of

16   Rochester, full-time pay and benefits from the City of

17   Rochester.  He himself engaged in alleged wrongdoing against

18   an employee of the union.  He was alleged to have engaged in

19   sexual harassment and sexual assault, and a lawsuit was

20   brought against the union president in his -- as a state

21   actor under 1983 claiming that because he is a full-time

22   employee, he's cloaked with authority from the state.

23           And the state -- and the Second Circuit in that

24   case found explicitly that when acting in his capacity as a

25   union president, he is not acting as a state actor cloaked

1    with authority to subject himself to 1983 liability and

2    ultimately dismissed that case because there were no set of

3    facts that could be presented to prove otherwise.

4            That case is nearly on point with the case in

5    front of you, the only difference being is that Robert Kroll

6    is not alleged to have actually done the act that caused

7    harm.

8            Likewise, in this court and the Eighth Circuit in

9    the *Magee versus Trustees of Hamline University* have also

10   found that in that case Dave Titus, who was a police officer

11   and president of the St. Paul Police Federation, wrote and

12   published an opinion piece in the newspaper calling for the

13   termination of a Hamline University professor.  The court in

14   Minnesota and the Eighth Circuit both found that there was

15   not a -- that that is insufficient to create 1983 liability

16   because in that case Dave Titus, although he identified

17   himself as a police officer, and likewise became the

18   president of the St. Paul Police Federation because of his

19   position as a St. Paul police officer, that is insufficient

20   to create 1983 liability because, like here, he was acting

21   in the scope of his position as a union president, not as a

22   police officer.

23           Here, the plaintiffs --

24           THE COURT:  Mr. Kelly, I think we would all agree

25   that the allegations as to Lieutenant Kroll are slightly

1      different.  They are slightly unique in this situation and

2      they have to do with the power and influence he allegedly

3      wields over this police force.  Whether or not he's -- he

4      certainly -- the allegation is not simply that he has 1983

5      liability because of his position.  It's what he's done with

6      his position.

7              And so my real question to you is how could I

8      decide that on the basis of the complaint?  Don't I need to

9      have a record of facts in order to determine under the case

10     law that occasionally holds private actors liable, or even

11     to determine whether he was a private actor in this case?  I

12     mean, you refer, for instance, to the contract and his

13     position and all that.  Those are all facts.  And at this

14     stage of the game I need to only consider the facts as

15     alleged true.  I'm not to look at other documents and

16     contradict the facts as alleged.

17             That may certainly be the case on summary

18     judgment.  I'm having trouble at this point figuring out how

19     I could do this at this stage of the game.

20             MR. KELLY:  Thank you, Your Honor.  First, I would

21     add, to address your first point in part, they are not

22     alleging that because of his position as union president

23     that he has liability.  However, that's actually what they

24     argue in their memorandum is that because he is the union

25     president of a public sector union, he is a state actor.

1    That is their argument.

2            Secondly, understood that, yes, you are supposed

3    to look at the face of the pleadings.  However, the

4    pleadings themselves and/or the plaintiffs' argument in

5    opposition acknowledge that it's solely because he is the

6    president that he is in fact liable as an actor.  And in

7    this case the pleadings embrace the contract between the

8    City of Minneapolis and the Police Officers Federation of

9    Minneapolis and should be considered.

10           And, you know, as far as the factual entry, there

11   are no facts that need to be discovered for this Court to

12   make a decision that as a matter of law, whether the

13   president of a police officers' -- of a union is a state

14   actor.  That is well settled that a union president is not a

15   state actor period.  That's settled Eighth Circuit, that's

16   settled Second Circuit.

17           Likewise, the next question is how he wields that

18   authority or that position.  Frankly, what the plaintiffs

19   are asking is essentially to create a *Monell* liability to a

20   third party private actor, which there is no law to support

21   such a position saying that a third party, the president of

22   a union, based upon statements that he makes in his capacity

23   as a union president, has an influence over the culture of

24   the police department.

25           So what they are trying to do is create private

1      actor liability under 1983 for a *Monell* claim, which would

2      be a claim against the City.  So as -- and in citing their

3      complaint in support of their position of the, quote,

4      unquote, undue influence, is all activity that's

5      protected -- not just protected, but required by -- for the

6      union to engage in, including engaging in collective

7      bargaining and filing of grievances when there's discipline

8      or discharge of officers for alleged violations of policy.

9            So those alone are protected by statute and the

10     Constitution, both his speech and filing of grievances and

11     engaging in collective bargaining.

12           What the plaintiffs allege is, at the most, is

13     they claim that there is an influence that he has -- they

14     acknowledge as a police officer, as federation president, he

15     is not acting as a police officer.  He's acting as union

16     president.  And when not acting as a police officer, he does

17     not have supervisory liability against him because he didn't

18     actually -- they didn't allege that Mr. Kroll directed any

19     of these officers to deploy munitions, nor could they with

20     any good faith.

21           In fact, all they are saying is that what they

22     cite to as examples are other instances over the, you know,

23     years before this -- the incident here in 2020 where Robert

24     Kroll spoke publicly in support of his members and filed

25     grievances seeking an independent arbitrator to overturn the

1    termination, the examples I gave, of two officers.

2    Ironically, of those two officers they cite as examples of

3    how disturbing it was that the union filed grievances for

4    termination, an independent arbitrator found that there was

5    just cause to terminate.

6          So the examples that the plaintiffs provide to

7    show that he somehow influenced excessive force is actually

8    rebutted by the actual proof of what happened and the

9    procedural history because it actually shows the opposite.

10   It shows that those officers, although a grievance was

11   filed, they ultimately didn't get their job back for their

12   alleged wrongdoing.

13         THE COURT:  Okay.  Well, let's just unpack that a

14   little bit.  I think there's two concerns raised by what you

15   say.  First of all, I interpret the plaintiffs' argument

16   about private actor 1983 liability not to be an argument

17   that they acted in concert with the City and are therefore

18   somehow in concert with the City's failure to train or

19   supervise or the City's policies.  Rather, as you point out,

20   the allegations have to do with his private actor liability

21   in concert with the John Does, that is attempting to

22   encourage or influence them to violate the training or the

23   City's policies.  That's how I interpret what the plaintiffs

24   are arguing, actually at cross purposes with the City.

25         But in the end, you know, going back to what

1    happened in the past in this procedural history that you

2    discuss about grievances and the like, that's hardly

3    embraced by the complaint.  I mean, those are fact questions

4    that the Court can better consider with a record.  I mean,

5    you may be right at summary judgment, but it's hard to

6    imagine at the motion to dismiss stage that we could dismiss

7    this claim.

8         So again, the two focuses for your response would

9    be this reframing of the private actor liability that I have

10   described.  And secondly, again my concern about doing this

11   at the pleading stage.

12        MR. KELLY:  Thank you, Your Honor.  So as far as

13   the private actor liability I pointed out in my reply brief,

14   but private actor liability is, under 1983, generally

15   prohibited with very few exceptions, the exceptions being a

16   conspiracy claim, civil conspiracy claim, where there had to

17   be specific allegations that the private actor acted in

18   concert with some other public official for the public

19   official to then wield their authority in violation of

20   someone else's civil rights.

21        There's no allegation that Robert Kroll contacted

22   John Doe 1 or 2 saying you should engage, use force, in the

23   following manners.  The complaint itself cites to a letter

24   to the chief of police, an e-mail to the chief of police and

25   the command staff that occurred after the majority of the

1    allegations that were made by plaintiffs, the specific

2    allegations of the plaintiffs, where it was a letter from

3    the union president to management voicing concerns of the

4    membership.  Period.  That is what a union official's job is

5    to do is to relay concerns about terms and conditions of

6    employment.

7            The other citation in the complaint was to a

8    letter after the fact to the membership that doesn't

9    reference essentially anything of the alleged conduct.  It

10   does not -- there's no call to arms.  There's no call to you

11   should use force.  All it points out is the union will

12   eventually voice their concerns at the lack of leadership

13   provided by state and local leaders during the riots.

14   That's it.

15           The complaint does not allege, nor could it

16   reasonably allege, that Robert Kroll engaged in a civil

17   conspiracy with specific actors to conduct specific actions.

18   The complaint itself, and their argument in support or in

19   opposition to our motion to dismiss, is specific about how,

20   as the union president, he holds influence and provides

21   input which somehow creates liability, which as a matter of

22   law it does not.

23           Now, if there were facts that were alleged, that

24   were properly alleged, that were supported and clearly

25   alleged in the complaint of a private actor engaging in a

1    civil conspiracy to violate the rights of others, then

2    potentially, sure, there would be a need for discovery to

3    determine what communication, if any, took place.

4         However, that's not what this complaint alleges.

5    This is a complaint that says as the union president, he is

6    a state actor.  End of argument.  And then as an

7    afterthought they say that, Well, some courts have

8    previously found private actors as liable.  But those cases

9    that are cited are very fact specific and would allege that

10   they were after the allegation, which there is not here,

11   that the private actor conspired with a public actor and the

12   public actor wielded the force.

13        There's no allegation in the complaint that Robert

14   Kroll requested any party to do any act because he did not.

15   The two communications that are cited prove otherwise.  They

16   prove exactly the opposite of that.  They are generally

17   speaking saying nobody is saying -- everybody is blaming the

18   officers for everything that's happened in the City of

19   Minneapolis and we will be here on the back end,

20   essentially.

21        The problem is, again, as a matter of law -- I

22   have to get back to it, I can't stress enough -- as a matter

23   of law, acts done as a union official are not state actor

24   actions.  If it's a general -- like you point out, if there

25   was an allegation that Kroll had personally contacted

1    specific officers and engaged them or encouraged them to do

2    an act, that would be a different story, but you just don't

3    have that here.  What they have in the allegations are

4    merely those two letters, and those rebut any claim of civil

5    conspiracy.

6            The reason why a claim against a public official

7    being a -- or a public sector union officer is not a state

8    actor under 1983 is because of the importance of public

9    sector unions to engage in speech.  As addressed in the

10   *Janus* decision from 2018, under the plaintiffs' theory,

11   every public sector union official is a state actor.  And

12   that's just -- that's an absurd result, and it would fly in

13   the face of *Janus* which notes the importance of the

14   separation between a public sector union and the government

15   as a whole.  Because if the -- if the union officials were

16   actually state actors, that would mean that they would be --

17   have to be responsible to the direction of the employer,

18   which would defeat the purpose of collective bargaining, and

19   in Minnesota, the Public Employment Labor Relations Act.

20           And on that note, the only case citing to the

21   proposition that a union be held liable that was cited by

22   the plaintiffs, held liable under 1983, was the *Dossett*

23   case.  But the quote that was attributed to *Dossett* actually

24   came from *Hudson versus Chicago Teachers Union Local No. 1*,

25   the quote regarding some public sector unions can be held

1      liable under 1983.  That was a very fact-specific case that

2      dealt with agency fees with public sector unions.

3              And that was another case where the union was

4      found to potentially have been a state actor because they

5      worked with the Government in withholding union dues from

6      members' paychecks.  So that is the only time that private

7      actors, including unions, are held liable is if acting in

8      concert with the -- with the Government.

9              The other cases were cited were private sector

10     organizations or private organizations that were either a

11     public function was completely turned over for their use,

12     like the airport case, and then they still wielded law

13     enforcement officials to do an act on their behalf at their

14     specific request to prohibit speech.  Again, what we have

15     here is an allegation that Bob Kroll wielded influence over

16     officers because he had made previous statements.  And part

17     of their -- in their complaint, in their argument, their

18     issue that they have is that Defendant Kroll failed to

19     acknowledge the rights of the citizens to peaceably gather

20     and protest.

21             But that's the important piece to note here is

22     that as the union president, as a union president, the

23     duties that Robert Kroll owes are to the members and to the

24     Police Officers Federation of Minneapolis.  Because he is

25     not a public official, he does not owe a duty to inform or

1    to train.  And in fact if he were to do so, he would be

2    impeding on the City and the Minneapolis Police Department's

3    duties to train the employees.

4          And because the complaint is based solely on his

5    position as union president and not because he engaged in

6    some sort of conspiracy with John Does, at this stage the

7    Court has sufficient information in front of it and as a

8    matter of law should rule and dismiss Robert Kroll from this

9    lawsuit.

10          THE COURT:  Thank you.

11          Who wishes to respond?

12          MR. DAVIS:  I do, Your Honor.  This is Mr. Davis

13    from Fish & Richardson again.  Thank you for having this

14    hearing and may it please the Court:

15          I think that based on what I've heard so far, Your

16    Honor has it exactly right based on how we see this and I'm

17    specifically referring to the importance of understanding

18    the difference between the pleading standard that the Court

19    has to consider at this stage under *Twombly* and *Iqbal* in

20    order for us to go forward and what the Court has to

21    consider at the summary judgment stage to see whether we

22    have identified and come forth with a triable issue of fact.

23          There were a few statements that Mr. Kelly made

24    there on behalf of Lieutenant Kroll that I want to address,

25    but the first and most important I think relate to whether

1      in fact Lieutenant Kroll cannot be a state actor as a matter

2      of law.  That's what Mr. Kelly said.  I just don't think

3      that's right, Your Honor.  It is the case that it is not

4      frequent that a union or someone acting within the union is

5      found to be a state actor, but even the case that we cite,

6      which is the *Montgomery* case, it's from the Tenth Circuit,

7      but that case which points to *Dossett* says that it's not

8      generally the case that a union, or police union in

9      particular, is a state actor.  And so it leaves open the

10     opportunity for there to be a state actor even if that

11     person happens to be the president of the union.

12             The two cases that they rely on, *Kern*, which I

13     think is a Second Circuit case, and then Magee from this

14     circuit, are both distinguishable and I want to talk about

15     those very briefly.

16             First, with respect to *Kern*, I think Mr. Kelly set

17     forth the facts accurately and that shows why that case is

18     different.  In that case it turns out that the party against

19     whom the 1983 action was alleged was the president of the

20     fire department union and he had made sexual advances and

21     actually attempted to rape his secretary in the bathroom, or

22     his administrative assistant.

23             And so on its face, the facts there were very

24     different because the allegations that were made were made

25     against him in his role as president and specifically having

1    nothing at all to do with his status as a firefighter other

2    than the fact that that was why he was in the role and why

3    he had that administrative assistant in the first place.

4    That is not the facts in this case at all.

5              Magee, admittedly, is a little bit closer, but

6    again, it's quite different in our view.  In that instance,

7    as I believe Your Honor is aware, the head of the union in

8    St. Paul wrote an op ed about the law professor at Hamline

9    and directed that towards the public itself in a newspaper

10   article.  And I think he encouraged -- Mr. Titus encouraged

11   another police officer to write a similar article and to

12   publish something that was facing the public more generally

13   and advocating a position that was clearly and squarely

14   within the four corners of the role as the president of the

15   union.

16             That is not the situation that we have here, Your

17   Honor.  In this case, Mr. Kroll -- while it is true that

18   Lieutenant Kroll is in his position because he is a police

19   officer, what we have alleged in the complaint and what the

20   Court can take judicial notice of based on the other issues

21   that we have identified in the footnotes to our complaint in

22   our brief, is that there is a long history of Lieutenant

23   Kroll in this jurisdiction exercising outside influence over

24   the police force for the entirety of the time that he has

25   been the president of the police union.  We put this in our

1    opposition brief but it's clear that Chief Arradondo himself

2    actually said to Lesley Stahl in a *60 Minutes* interview

3    shortly after all of this happened that Lieutenant Kroll

4    exercised influence over the police officers.

5            And Your Honor is correct.  I think you have

6    nailed the allegations that to the extent that there is

7    private actor liability -- I don't think we need to go

8    here -- but to the extent that there is private actor

9    liability, it has to do with the relationship that

10   Lieutenant Kroll has with the John Does.  The outside impact

11   and influence that he has on the rank and file police

12   officers and how that impacted what we saw over four days in

13   May from the 26th to the 31st on the streets of Minneapolis.

14           It is absolutely true that after we have an

15   opportunity for discovery, we may be back in front of Your

16   Honor and Mr. Kelly may stand up and say they haven't educed

17   the facts that they need and so summary judgment is

18   appropriate.  And if we haven't, then I will have a

19   challenging time to make those arguments because we won't

20   have developed any triable issues of fact.

21           But at this stage of the case what we need to do

22   in order to defeat their motion to dismiss is show that

23   based on what is pled, accepting all those allegations as

24   true, as well as to real inferences that Your Honor can draw

25   from those allegations, whether with discovery we can prove

1    up this case.  And based on the allegations that we made, we

2    would suggest to Your Honor that that is absolutely the

3    case.

4              Is it plausible to believe and to suggest that

5    Lieutenant Kroll, in encouraging that officers engage in

6    warrior training and how they approach the citizenry of

7    Minnesota and Minneapolis could lead us to develop discovery

8    suggesting that Lieutenant Kroll actually had officers who

9    were impacted by what he said?  Absolutely.  That is a

10   plausible explanation for what discovery would show.

11             Is it reasonable to believe that when the city

12   council members that we have quoted in our complaint and the

13   chief of police himself and others have suggested this role

14   that Lieutenant Kroll has is having an impact on the rank

15   and file officers and that Lieutenant Kroll knows and

16   understands and actually takes active steps to do that, the

17   discovery may show that based on how we pled this, we would

18   say the answer to that question is absolutely yes.

19             Is it a foregone conclusion that Lieutenant Kroll

20   is acting under the color of law as is required to be a

21   state actor primarily?  We've pled it enough here.  And I

22   understand Your Honor pointed out that, you know, there were

23   things that were outside of pleadings that Lieutenant Kroll

24   attached to his motion to dismiss; and Your Honor doesn't

25   need to look at all that to satisfy herself, I think, that

1    the allegations are sufficient.  But to the extent that Your

2    Honor does, those things actually support what we're saying

3    and the role that Lieutenant Kroll plays not just merely

4    because he happens to be the federation president, but

5    specifically the role that he plays in interacting with the

6    police and in influencing policy.

7          Let me just touch very briefly on the speech issue

8    that was raised in the briefing and that Mr. Kelly spoke

9    about briefly when he was arguing.  We said this in our

10   brief and I want to reiterate it here.  The allegations that

11   we have made in the complaint against Lieutenant Kroll have

12   not, and do not, intend to quell him from speaking his mind

13   or to somehow circumvent his ability to exercise his First

14   Amendment rights.  He is absolutely right that we and the

15   ACLU filed this case in parts because we were so concerned

16   about quelling and circumscribing the exercise of First

17   Amendment rights.

18         But when someone who is a lieutenant highly

19   regarded in the Minneapolis Police Department and someone

20   who also happens to be the president of the police union is

21   exercising speech in a way that he reasonably knows, or

22   ought to know, has an impact on the rank and file such that

23   there end up being ordinary citizens who are exercising

24   their constitutional rights, and those rights are deprived

25   as we have alleged in this complaint, we don't think that

1    that is an absolute and complete defense to our allegations.

2    I don't believe I saw in either the opening brief or the

3    reply from Lieutenant Kroll a case that said that a First

4    Amendment allegation -- a First Amendment was a complete

5    defense to a 1983 allegation.

6            Finally, Your Honor, on this point, unless you

7    have questions, I'll leave on this.  I want to address the

8    private actor liability issue.  As I said, we don't think

9    you need to get that far at this stage, but to the extent

10   Your Honor does, I would encourage the Court to take a look

11   at the cases that we cited and that Mr. Kelly cited on

12   behalf of Lieutenant Kroll.  I could be wrong.  I've read a

13   lot of cases preparing for this hearing, but I don't believe

14   that any of the cases that were cited on this issue say as a

15   matter of law that we need to plead a civil conspiracy in

16   order to satisfy the *Twombly-Iqbal* standard to make out an

17   allegation for a private actor liability.  I don't think any

18   of the cases that Mr. Kelly cited say that.

19           What they say is there needs to be a persuasive

20   intertwinement of acts between the private actor and the

21   actual state actor that caused the depravation of rights.

22   And here, as we've alleged, we don't think there's any

23   question that if the Court were to view Lieutenant Kroll in

24   his private capacity, that those allegations are sufficient

25   to withstand *Twombly-Iqbal* at this stage.  So unless the

1     Court has questions, I'll rest on briefs.

2               THE COURT:  Thank you.

3          Okay.  Mr. Kelly.

4               MR. KELLY:  Thank you, Your Honor.  So I just

5     wanted to address again that I think it's been made clear

6     that the plaintiffs' position is that as the federation

7     president, Robert Kroll is a state actor as a matter of law.

8     The case law says otherwise.  The case law from this circuit

9     and the Second Circuit says otherwise.

10              THE COURT:  I have to interrupt you there.  I

11    didn't hear that.  What I heard is that he might be a state

12    actor and so we need to see a record to determine that.

13    What they are arguing is you can't -- the Court shouldn't

14    rule at this point that he's not a state actor as a matter

15    of law.  Okay?  It's a little bit different than the way you

16    described it.

17              MR. KELLY:  Understood, Your Honor.  But the

18    status, it's not that there's no factual entry that needs to

19    be made about whether somebody is a state actor or not.

20    It's clear whether you are a state actor or not.  And that

21    case law is clear that union officials when acting in their

22    capacity as a union officer are not state actors and are

23    subject to 1983 liability.

24              THE COURT:  That's the *Magee* case, and I have

25    looked at it before and I just can't remember the answer

1    right at this moment.  Was that decided at the pleading

2    stage or at summary judgment?

3             MR. KELLY:  Pleading stage, Your Honor.  It was a

4    motion to dismiss; and then *Magee II* was a denial of a

5    motion of a request to amend the pleadings to include the

6    Saint Paul Police Federation as a defendant.  And they, in

7    the second *Magee*, found that there's no plausible facts that

8    could be found that the union -- the St. Paul Police

9    Federation was liable under 1983 either.

10            Now, *Magee*, what I pointed out, was the

11   possibility of private liability for 1983 purposes.

12   However, *Magee* also addressed the -- at the pleading stage,

13   whether Dave Titus as the federation president, whether

14   enough facts were pled to provide private actor liability to

15   1983.  And what you need to properly plead is a willful

16   participation in joint activity with the state or its

17   agents.  Joint activity in that case, in *Magee*, which also

18   cited *Gibson versus Regions Corporation* and *Lugar versus*

19   *Edmondson Oil*, pointed out joint activity needs to be a

20   meaningful meet -- it needs to be a meaningful meeting of

21   the minds.

22            And in this case and in *Magee*, what they alleged

23   was that there generally was a meeting of the minds; but

24   what actually was alleged was an opportunity for the meeting

25   of the minds.  Which, like here, that's all that's been

1    alleged is that Defendant Kroll holds a position with the

2    police federation so he has the opportunity to meet and

3    speak with officers.

4           But what you don't have here in the complaint is

5    an allegation with specificity to be able to respond in a

6    meaningful way of a -- of joint activity between Kroll and

7    any of the actors that performed alleged wrongdoing.

8           As acknowledged by the plaintiffs, all they are

9    alleging is that Robert Kroll, as the police federation

10   president, holds influence and people are impacted by what

11   he says.  That is not enough even for a civil conspiracy.

12          But that's not even what's pled in the complaint.

13   But assume that it was pled in the complaint.  That's not

14   enough that they can plead a civil conspiracy because a

15   one-way statement, which is exactly what we have here as

16   alleged, statements from Kroll, is insufficient as a matter

17   of law pursuant to *Magee*.  You need an actual meeting of the

18   minds, which is not pled in the complaint.  And for that

19   reason, the complaint fails against Kroll.

20          And exercising speech, whether it -- again,

21   one-sided speech is not enough to then create liability for

22   the wrongdoings of somebody who heard that speech with very

23   specific exceptions.  Those exceptions being, you know, your

24   defamation or an immediate call to arms.  But as the ACLU

25   has pointed out previously, even in those cases where

1     there's an allegation of somebody saying if you go into that

2     store we're going to break your neck, that's not enough for

3     calling for a riot or creating any sort of liability for

4     wrongdoings of others.

5             What you have here is a vocal, outspoken president

6     of the union that I completely understand a number of

7     people, including the plaintiffs, do not like what he says.

8     However, he cannot be held responsible for alleged

9     wrongdoing of a third-party who said -- who even if they did

10    say his statements influenced me to decide to use force,

11    unless there's allegations specific saying, you know,

12    Defendant Kroll was on the scene and told me to do this act,

13    that would create liability.

14            But you don't have that here.  What you have here

15    is allegations that Defendant Kroll as the president of the

16    police federation makes statements which created influence

17    over the department which ultimately led to the injuries

18    that the plaintiffs suffered.  That is not enough to survive

19    this motion to dismiss.  Because Defendant Kroll is a

20    private actor, the only way that they would be able to find

21    liability was some sort of civil conspiracy with a meeting

22    of the minds, and that's not alleged here.  So because of --

23    because of the lack of a conspiracy alleged, we're asking

24    that you grant our motion to dismiss.

25            THE COURT:  And, Mr. Kelly, you would agree if I

1    did that, that that would be without prejudice.  In other

2    words, if there was discovery that reflected some sort of --

3    I'm not sure it needs to be a conspiracy, but whatever it

4    needs to be, we could revisit whether or not new allegations

5    were sufficient.  Is that right?

6            MR. KELLY:  Yeah, Your Honor.  And frankly, that

7    was kind of the position at this early stage.  This is a

8    different story if through discovery they find that --

9    assuming that Kroll was not named as a defendant in this,

10   and through discovery and depositions they found, well,

11   Kroll was calling us and actually was the one telling us

12   where to shoot and who to shoot because of personal animus

13   or whatever it may be.  At that stage, then I think it would

14   be reasonable to allow plaintiff to amend the pleadings to

15   include a necessary party.  But at this stage there's not

16   enough -- there's no facts alleged that Kroll was involved

17   in any way, shape, or form with the actions that took place

18   during the riots.

19           THE COURT:  Okay.  Well, the Court will have do

20   study this carefully.  It's kind of a unique situation.

21   I'll go back and take a careful look at the allegations and

22   the *Magee* case and see what -- okay.  I'll take a look at

23   it.

24           MR. KELLY:  Thank you.

25           THE COURT:  All right.  You bet.  Finally we'll

1    consider the motion to dismiss the amended complaint that

2    was filed by the State defendants.

3            MR. WEINER:  Good morning, Your Honor.  Good

4    afternoon to our east coast colleagues.  Joe Weiner on

5    behalf of the State defendants and we move to dismiss the

6    plaintiffs' complaint in its entirety.

7            As to the State defendants, the amended complaint

8    is long on legal conclusions but lacking in factual

9    allegations; and the allegations are made not only in their

10   official capacity, but the individual capacity against State

11   defendants Harrington and Langer.  And those allegations are

12   sparse and insufficient to state a claim.  What we see are

13   three specific paragraphs that have allegations regarding

14   them out of 182 in the complaint.

15           The official capacity claim fails because there's

16   no likelihood of future injury.  Both the official and the

17   individual capacity claims fail because there's no factual

18   claim to support a pattern or practice engaged by the State

19   defendants.  Qualified immunity would also bar the

20   individual claims against the State defendants because

21   there's no history of a pattern or practice of anything

22   along here.  And the only allegation, the only allegation in

23   the entire complaint that would support some type of

24   history, is in a reference to an event on Interstate I-94 in

25   2016 that was made upon information and belief that is

1    factually dissimilar from what we have that occurred here.

2            Finally, the majority of the plaintiffs lack

3    standing because they did not experience any injury from the

4    State defendants in this matter.

5            As the Court can see, most of the amended

6    complaint are allegations about -- from plaintiffs other

7    than Max Fraden regarding other defendants than the State

8    defendants.  There are only three specific allegations about

9    the State defendants.  Two of them are jurisdictional, and

10   the other one on paragraph 103 made against Harrington and

11   Langer are made in their official capacity.  It's very clear

12   that that's what they are doing.

13           So for purposes of this motion and for purposes of

14   this case, really what's at issue, it's the incident that

15   occurred on May 30th where plaintiff Max Fraden was near

16   Bobby and Steve's Auto World after curfew.  He alleges that

17   somebody fired less lethal munitions without warning.  He's

18   not sure if it was one individual, if it was multiple

19   individuals.  He's not sure if it was a state patrol

20   individual or if it was an MPD individual or somebody else

21   who did that.  There was lots of law enforcement there.  And

22   much of the allegations are on information and belief.

23   That's the extent of the allegations, the factual

24   allegations, against the State defendants.

25           What remains are a number of allegations that the

1    plaintiffs have identified as municipal allegations which

2    it's an odd term because the state defendant -- the legal

3    framework is different for municipalities as to State

4    defendants.  But what it appears to be is pleading a pattern

5    and practice claim that there was a failure to train or

6    failure to supervise by the individual State defendants.

7           But these complaints or these allegations are

8    largely legal conclusions without any additional factual

9    support.  And this is in contrast to where they make

10   allegations as it relates to the Minneapolis Police

11   Department where there are very specific allegations about

12   ordinances, about policy manuals, about policies that they

13   claim were not followed or that are insufficient.

14          As to the official capacity claim, one thing is

15   clear -- and I think we can all agree on this -- the

16   plaintiffs have identified that they are not seeking damages

17   against the State defendants on the official capacity claim.

18   Indeed they can't under case law.

19          So the only relief that they are seeking is

20   prospective declaratory or injunctive relief as it relates

21   to the State defendants.  And to do that, they have to show

22   that there's a likelihood of future injury; and that

23   likelihood must be imminent, not speculative, and there has

24   to be a real and immediate threat.  And in support of that,

25   they have pled exactly one incident in 18 years: the

1    incident on May 30th involving Max Fraden.

2           And so the question for the Court in looking at

3    the prospective relief and whether or not this is likely to

4    be repeated, is what sequence of events would need to be

5    shown that there would certainly be a repeat of this

6    incident.

7           First of all, there would have to be the same

8    level of unrest.  And I know that plaintiffs have said that

9    there will be the same level of unrest or there may be the

10   same level of unrest.  But what we have, the record in the

11   complaint, is that from 2002 to 2020 there has been exactly

12   one incident where this occurred and it occurred when there

13   was a period of unrest that was unprecedented in the history

14   of Minneapolis.  That was unprecedented -- it was after

15   three days of the incident -- of the unrest already

16   occurring.

17          And what we see is that before that incident

18   there's no allegations that the state patrol had engaged in

19   any type of unconstitutional conduct.  And as the plaintiffs

20   point out in their brief, there have been a number of times

21   subsequent to May the 30th where the state patrol has been

22   called up to participate in law enforcement activities for

23   the state and there have not been similar allegations

24   regarding misconduct.

25          There would need to be a policy of the use of

1    chemical irritants without warning.  And again, the only

2    thing that we have is the one incident that's pled in the

3    complaint.  That's all that we're looking at here under the

4    four corners of the complaint.  The state patrol would have

5    to be activated, Plaintiff Fraden would have to attend, and

6    there would have to be the use of chemical irritants in

7    spite of him being law abiding.  And quite simply that

8    sequence of events is not plausible based on what has been

9    pled in the complaint.

10            There, as the *Alliance* case indicates, there has

11   to be what the sequence of event is that creates this

12   situation.  And here all of these sequences and all these

13   events would have to occur within that chain of event.  And

14   what we have is one incident in 18 years that may or may not

15   have even been a state patrol officer; and that does not

16   meet the imminent and immediate threat standard for

17   prospective relief under an official capacity claim.

18            In terms of the individual capacity claims, Your

19   Honor, the plaintiff it appears is pursuing a failure to

20   train and supervise claim individually against Commissioner

21   Harrington and Colonel Langer.  But there's no allegation

22   that Commissioner Harrington or Colonel Langer were

23   personally involved either in the incidents that occurred,

24   everyone agrees to that, but also that they were personally

25   involved in any type of negligent or improper training and

1    supervision.

2           And more than that, as I've stated earlier, the

3    complaint itself explicitly as it relates to those municipal

4    allegations, there's a whole heading in the complaint as it

5    relates to that, makes clear that the claims against

6    Harrington and Langer are made in their official capacity.

7    And the Court should hold the plaintiffs to their pleadings

8    in that, like the *Baker* case, that if they plead in their

9    official capacity, it doesn't matter what they put in their

10   caption.  What are the allegations in the complaint?  And

11   the allegations of the complaint, at least as it relates to

12   the pattern and practice claim, appear to be that these are

13   official capacity claims.

14          Additionally, the plaintiffs implicitly

15   acknowledge that the pattern and practice allegations in the

16   complaint are not in fact factual.  On pages 15 and 16 on

17   their brief, they bullet out the various allegations that

18   relate to the pattern and practice claim.  State defendants'

19   failure to supervise and train their employees and agents

20   with respect to Fourth Amendment protected activity amounts

21   to a deliberate indifference to the rights of plaintiff and

22   putative class members.  That's one example, and there's a

23   number along those lines.

24          And they go on to say:  "These allegations,

25   coupled with plaintiffs' factual claims of the conduct of

1    specific officers on May the 30th, show that there's a

2    violation of a constitutional right."

3              They acknowledge the factual claims that they have

4    in this complaint, very narrow.  It's basically paragraphs

5    90 through 99 as it relates to the State defendants; and the

6    rest of them are legal conclusions that they are trying to

7    use to loop back to create a pattern and practice claim.

8    And that's just simply not what the law is.  What is the

9    policy?  Is it written?  Where are the references to that

10   policy?  We see that as it relates to the Minneapolis Police

11   Department.  We don't see that otherwise.

12             And what exactly did Langer and Harrington do?

13   The complaint is absolutely silent as to those two

14   individuals and what it is that they did.

15             There's also a claim in the briefing that the

16   qualified immunity defense doesn't apply because plaintiffs

17   are seeking declaratory relief, and that's at the bottom of

18   page 16.  And I think what that's admitting is that this is

19   essentially an official capacity claim.  I don't know, other

20   than damages, what type of relief an individual capacity

21   claim could have against these two individuals because if

22   the issue is we want an injunction to tell Commissioner

23   Harrington and Colonel Langer to do better training or to

24   supervise differently, that's an official capacity claim

25   right there.  That isn't an individual capacity claim.

1          And I think ultimately all of this is clear that

2     the reason that there is no individual claim is that there

3     is no personal involvement.  Nothing has been pled, nothing

4     is in the complaint as it relates to Commissioner Harrington

5     and Colonel Langer.

6          Even if there were a potential individual immunity

7     claim, there would still need to be pleadings that show that

8     those individuals were aware of and failed to correct a

9     pattern of unconstitutional conduct.  It's not pled anywhere

10    that they were aware of a pattern.  As I stated numerous

11    times, there's no other similar situation that's been

12    identified.  And there is no course of training that has

13    been identified with factual specificity as deficient.

14         Again, it's not whether or not a claim is

15    conceivable.  It's whether it's plausible on its face, and

16    that we don't have.  The *Krigbaum* case cited in our briefing

17    controls, and plaintiff attempts to distinguish that case on

18    the basis of the fact that it's a summary judgment case, but

19    the summary judgment posture is unimportant.  For purposes

20    of qualified immunity, the Court should resolve those issues

21    at the earliest point possible in the litigation.  And we

22    see that in the *Payne* case, and it's why State defendants

23    have the opportunity for an interlocutory type of appeal on

24    a qualified immunity type of an issue.

25         It's not to say that that's what's going on in

1    this situation.  It's just to say that there has to be more.

2    It's not a matter of there needs to be discovery to find

3    this out.  It's not a matter of there could be some facts

4    that are alleged out here.  It's they are making claims

5    against these individuals in their individual capacity and

6    they need to do more in terms of the pleading to present

7    that to the Court and to be allowed to go forward on that.

8            There is the argument -- I think those arguments

9    by themselves would dispose of the case as it is.  But if

10   any of it were to remain, there's still the fact that the

11   due process claim is duplicative.  We identify that in our

12   briefing.  The *Gerstein* case is on that and it's essentially

13   duplicative of a First Amendment claim; and if it's

14   duplicative, there's no reason for it to be there and it

15   should be dismissed if anything were to remain.

16           Finally, there's a standing issue for a number of

17   these plaints.  Plaintiff Levy Armstrong, Plaintiff

18   Armstrong, Plaintiff Hempfling and Plaintiff Clark were not

19   injured by the state patrol.  And what the plaintiffs are

20   asking is a radical departure from the standing

21   jurisprudence.  What they want to say is that these

22   individuals, who were not injured by the named defendants or

23   by any of the defendants identified, State defendants,

24   should be allowed to continue to pursue claims against them.

25   And the only thing they have to support them in that

1    argument is the case law involving pre-enforcement

2    challenges to statutes and rules.

3              And that's just simply not -- that's not what this

4    case is about.  For statute and rule, there's not an alleged

5    misconduct.  The issue is the only way that I can make sure

6    that the statute is not going to apply to me pre-enforcement

7    is to bring a challenge.  Here, there is the fact that they

8    already made a claim that the state patrol, at least on one

9    day, engaged in this type of activity.

10             And the case law is that there needs to be

11   credible threat of prosecution thereunder.  It's not threat

12   of prosecution that someone is going to use chemical

13   irritants on somebody.  That's why the pre-enforcement

14   challenge case law doesn't apply.

15             And all of the law on the prospective relief that

16   we're looking at in terms of the official capacity claims

17   refers to whether the conduct will repeat, which of course

18   assumes that there's already an incident that occurred

19   before that conferred standing in the initial incident.  So

20   that's what we don't have here.

21             To use an analogy, I can't sue the Attorney

22   General Bill Barr to enjoin the use of chemical irritants in

23   front of The White House, even though when the pandemic is

24   done I plan on going back to The White House and being there

25   in the square.  There may be people who have -- who were

1    injured and have the ability to state a claim and have

2    standing to do that, but it's not me.  I wasn't injured and

3    I can't do it.

4           It's the same for all of these plaintiffs except

5    for Plaintiff Fraden who has identified specifically the

6    state patrol for some type of injury that he entailed or he

7    incurred.

8           So, Your Honor, what we have here is one event

9    that may or may not have even involved the state patrol that

10   would have occurred after three days of unprecedented

11   unrest, and that does not make a pattern or practice.

12   That's at the heart of this matter and the amended complaint

13   fails to state a claim upon which relief can be granted.

14   Whether it's in the official capacity, whether it's in the

15   individual capacity, the claim should be dismissed; and also

16   for the reasons of qualified immunity and lack of standing.

17          And unless the Court has any questions, I'll

18   reserve my time to respond to plaintiffs on this.

19          THE COURT:  Thank you very much.

20          Who wishes to be heard?  Mr. Davis?

21          MR. DAVIS:  It is, Your Honor, and I know we're

22   running up on two hours and so I want to be mindful of the

23   Court's time, but there's a lot to say grace over there that

24   Mr. Weiner addressed and so I need to take those arguments

25   on.

1      I think we've -- to say as a baseline, I think we

2    fairly addressed much of what he said in our briefs and

3    would rely on those briefs.  But just to raise a few points,

4    Your Honor.

5      First, the State defendants go long, I think, in

6    their brief on this notion that we pled things on

7    information and belief and therefore they are somehow

8    defective on their face and can't support -- can't support

9    our allegations going forward.

10      And so I just want to be very clear.  This case is

11    not like the *Kampschroer* case or the other cases that

12    Mr. Weiner and the State defendants cite specifically

13    because when you look at the allegations of what was pled on

14    information and belief, there's no question that it

15    happened.  It was pled on information and belief, for

16    example, because Dr. Fraden wasn't exactly clear who it was

17    who was always firing the less lethal munitions.  But it's

18    very clear, it's pled in the complaint, and in fact I think

19    in the *Goyette* case of which this Court can take judicial

20    notice of the complaint, the Minnesota State Patrol has now

21    said that they were firing less lethal munitions and tear

22    gas.

23      And so those allegations made on information and

24    belief, Dr. Fraden knows that he was out there.  He knows

25    that he was kettled and that a group of approximately 150

1    other individuals were.  Dr. Fraden clearly, we have pled,

2    understands that there were a group of them that were

3    together kneeling, some of them in prayer, when they were

4    fired upon.  What was pled in information -- on information

5    and belief is that some of the time it was MPD and some of

6    the time it was MSP, Minnesota State Patrol, and that's why

7    it was pled, number one, on information and belief; and

8    number two, why there are specific paragraphs that call out

9    both of them in the alternative.  So I just wanted to clear

10   that up.

11           One thing I do want to point out to the Court and

12   I want to apologize.  There was a typo in our brief that

13   cited 2002 -- when it said 2002 and that was supposed to be

14   2020, and I saw that and it confused me when I saw the State

15   defendants' reply brief and they kept referring to incidents

16   that have taken place over the last 18 years.  That cite,

17   and I believe it's at page 9 of our brief, should have been

18   May of 2020.

19           And the point there, though, is the context is

20   clear from the overall sentence in which what we were

21   pointing out to the Court in terms of this issue of whether

22   there was going to be additional actions is that twice since

23   the events that were complained of in the amended complaint

24   there have been further protests.  There have been further

25   incidences and there have been further specific instances in

1    which the Minnesota State Patrol was called up.  That they

2    worked hand in hand, in concert I think as some of the

3    documents say, with MPD, and that there were -- there was

4    kettling that took place.

5            And so to suggest that the likelihood that this

6    will not happen again and that it's not real and imminent

7    and is perhaps speculative, we would suggest to the Court is

8    just wrong and it ignores the reality of the world in which

9    we live right now and what has happened in 2020.

10           Since Derek Chauvin was arrested and George Floyd

11   was murdered, those protests took place throughout

12   Minneapolis, throughout the State of Minnesota and the

13   world, and since that time there have been specific -- at

14   least three specific instances we are aware of since the

15   State defendants put their briefs in in which there were

16   further types of protests that at least some of the main

17   plaintiffs here participated in.

18           It was when one of the counts against another

19   former officer who was there on the scene was dismissed.  It

20   happened again when bond was set for that former officer.

21   And as an aside, it happened yet again I think in the

22   fallout in the immediate days after the election just over a

23   month ago.

24           And so it is absolutely the case that there is a

25   likelihood that this will happen again, especially because

1    we know that these cases are moving forward.  The wrongful

2    death suit is moving forward.  The case against Officer

3    Chauvin is moving forward.  And we know that there are going

4    to be further issues.  We know and have pled that these

5    named plaintiffs and many others intend to protest again,

6    depending on what the outcome of those events are and how

7    things develop.  But there's no question that there's a

8    likelihood of it happening again.

9            There also is no question, Your Honor, that it

10   wasn't just Mr. Fraden who experienced a specific harm or

11   injury by Minnesota State Police.  We need to be real clear

12   on this.  I think it was Ms. Sarff earlier who said that the

13   Court ought to use its common sense and that the law allows

14   that when assessing these issues.

15           We're talking about a situation in which hundreds,

16   if not thousands, of individuals were out protesting.  Most,

17   the vast majority of them, not all, but most were doing so

18   peacefully.  And those individuals that were protesting

19   peacefully recognized and acknowledged that there was a

20   police presence that was there and that they were being

21   deprived of their constitutional rights.

22           Now, do the Armstrongs and Ms. Hempfling and

23   Ms. Clark specifically allege that during the five-day

24   window they were -- there were projectiles, less lethal

25   munitions that were fired at them by the Minnesota State

1    Police and they were hit?  They don't specifically allege

2    that right now.  Do they allege that their desire to

3    participate in their protected First Amendment rights has

4    been chilled by the overall events and effects that happened

5    while they were protesting over that five-day period?

6    Absolutely.  Including the presence of the Minnesota State

7    Police.

8              So to suggest that four of the five named

9    plaintiffs haven't suffered a specific injury because the

10   photographs showing the severe bruising that they got was

11   limited to the projectiles that during that time were fired

12   by MPD ignores the reality of the situation.  Just as much

13   as MPD's actions chilled the all five named plaintiffs'

14   desire to exercise their free speech rights, it will happen

15   going forward.

16             And so we fully believe from a prospective

17   standpoint there is an adequate basis to find standing as to

18   all five of these named plaintiffs.

19             I do want to take a moment, although Mr. Weiner

20   didn't specifically mention it during his argument, I think

21   one of the cases that they cited in the briefs, I think it's

22   pronounced *Elend*, E-l-e-n-d, it's an Eleventh Circuit case

23   from 2006, and that case was different because we were

24   talking about in that case a one-time visit when President

25   Bush showed up at the University in South Florida and the

1    plaintiffs had protested and some things happened about

2    which they complained and filed a 1983 action.  And the case

3    there wasn't able to go forward in part because there was an

4    issue with saying, Hey, President Bush has no plans to come

5    to the University of South Florida again, and so the -- and

6    if so, it's not going to be any time soon and so the

7    imminence issue here creates a problem.  Our facts are very

8    different from that for the reasons that I just set out.

9           On the issue of official capacity versus

10   individual capacity, I will acknowledge to Your Honor that

11   at least my view is that of all of the issues that Your

12   Honor has before her that you are considering today, that is

13   perhaps the most challenging that we have.

14          Having said that, part of the reason why there is,

15   number one, so much set forth in the complaint, the amended

16   complaint, about the policies and the practices and the

17   course of conduct for the Minneapolis Police Department but

18   not the Minnesota State Patrol, quite frankly, Your Honor,

19   was because it was what we had access to.

20          And this is a situation where I would say there's

21   information that is uniquely within the possession, custody

22   and control of the Minnesota State Police Department that we

23   don't have access to.  And so to suggest that our pleading

24   is defective because we don't have access to that

25   information I think is inconsistent with what the law

1    requires at the pleading stage.

2           One thing that I did not hear in counsel's

3    argument, but that Your Honor raised with others, I do think

4    that to the extent that the Court finds an issue with the

5    individual capacity claims, we find ourselves in a situation

6    where those certainly should be dismissed with prejudice for

7    the reason I just said.  Discovery should bear out, and we

8    expect will bear out, our ability to make out those

9    allegations if the Court believes that they are not

10   adequately made out here right now.

11          On the qualified immunity issue, we heard much of

12   this from the factual issues during the argument on the City

13   defendants, but we think that there's no question that

14   there's a clearly-established rule here.  We're talking

15   about a constitutional violation that we believe is clear.

16   And that section that was referenced by counsel earlier,

17   paragraphs 90 through 99, where in exemplary fashion

18   Dr. Fraden sets forth his experience, including the fact

19   that there were folks who were gathered and who were praying

20   and were fired upon, is sufficient to go forward at this

21   stage of the case.  It's really not a quantitative issue

22   here so much so as a qualitative one.  We think that

23   qualitatively that is sufficient to move forward.

24          On the issue of procedural due process and the

25   duplicative one -- excuse me -- of the duplicative nature of

1    the claims, we would -- I'm not sure that we would agree

2    with Mr. Weiner's predicate position, but even if he's

3    right, that doesn't suggest that dismissal was appropriate

4    at this stage of the case.  If in fact the belief of the

5    State defendants is that the allegations are completely

6    overlapping, then that would mean, in turn, that discovery

7    is going to be completely overlapping and that there's no

8    additional burden to anyone to go forward.

9            The law allows us to plead issues in the

10   alternative, even make causes of action that are

11   inconsistent with each other at the pleading stage if we so

12   chose.  That's not a reason to dismiss the claims.  But in

13   point of fact, we do think that there's a fundamental

14   distinction as pled between the First Amendment claims and

15   Fourteenth Amendment claims that counsel raised.

16           I didn't hear counsel raise this, but since it's

17   in the brief let me just note this briefly, Your Honor.

18   There is a long body of case law that suggests that deciding

19   issues relating to class certification at this early stage

20   really is -- if not inappropriate, at least it's something

21   that is frowned upon.  And so to the extent that the State

22   has argued somehow that these five named plaintiffs are

23   defective or deficient, we would say that it's not time to

24   make that decision and that's not a reason to dismiss our

25   case going forward.

1          I'll end here just with one point and that is that

2     on the issue of whether individual capacity claims are

3     appropriate for injunctive relief, I'm advised that *Ex Parte*

4     *Young* expressly confirms that that is appropriate and so

5     that is the basis on which to deny the motion as set forth

6     and argued by Mr. Weiner as well.

7          So thank you for your accommodation and your time,

8     Your Honor.  Unless you have questions, I will cede.

9          THE COURT:  Thank you, Mr. Davis.

10          MR. DAVIS:  Thank you.

11          THE COURT:  Briefly, Mr. Weiner.

12          MR. WEINER:  I promise, Your Honor.  I hope less

13     than three minutes.

14          First of all, in terms of the information, upon

15     information and belief pleading, the one that's really at

16     issue in this case is the one that was made about the 2006

17     incident, because what's at issue here is was there a

18     pattern or practice and is there a likelihood that this is

19     going to happen again.  And one incident does not create a

20     pattern.  It simply does not.  Possibly two could.  I'm not

21     sure that it does, but that's not what we have here.

22     Because the only thing that we have that relates to a

23     potential pattern is the 2016 incident that was filed -- or

24     pled upon information and belief.  And again, factually

25     dissimilar based upon the public record as to what occurred

1    there.

2              Counsel spoke about the fact that of course we

3    know there's going to be further protests, we know there's

4    going to be further issues.  That's not what's at issue

5    here, Your Honor.  What's at issue here is whether or not

6    the defendants, the State defendants, are going to

7    unconstitutionally prohibit those by either using less

8    lethal projectiles or chemical irritants or something to

9    that effect.  And if anything, the fact that there have been

10   three situations that have already resulted in protests,

11   including some of the people who are plaintiffs in this

12   case, and there has not been a repeat, just goes to show

13   that the plausibility factor that the Court needs to

14   consider just doesn't exist based on the one incident that's

15   been pled here.

16             In terms of the argument that it's not just

17   Plaintiff Fraden who was affected but all of the plaintiffs

18   because their desire to participate has been chilled,

19   standing requires, quite simply, that there be an injury in

20   fact; that they be injured by the State defendants.  And

21   there has not been pled, nor can it be pled, any injury that

22   these other plaintiffs have suffered as a result of any

23   action by the State defendants.

24             And when we talk about the class certification

25   issue, that's where that really comes into play.  Because if

1    there's no standing, you can't be a class rep, and that's

2    what the State defendant has looked at.

3          Finally, the qualified immunity situation, we

4    haven't claimed that whether or not some of these things are

5    clearly established protected rights, whether being subject

6    to chemical irritants without a notice of that happening,

7    whether or not that could be something, we haven't argued

8    that that's -- that it doesn't -- it's not a clearly-

9    established right.  What we have argued is that it's not

10   clearly established that with one incident that serves as

11   the basis for the complaint, supervisors can be held liable

12   for the actions of the individuals that occurred here for

13   failing to supervise or failing to train.  And there have

14   been no allegations in the complaint that it relates to

15   either of those facts.

16         And for all of those reasons, including what we've

17   already discussed, we respectfully request that the Court

18   dismiss the complaint and thank you very much for your time

19   this morning, Your Honor.

20         THE COURT:  Very good.

21         MR. DAVIS:  Your Honor.

22         THE COURT:  Yes, Mr. Davis.

23         MR. DAVIS:  I apologize.  I was advised after I

24   finished speaking that I may have misspoken and said that we

25   believe the claims should be -- if they're dismissed, they

 1      should be dismissed with prejudice.  If I said that,

 2      obviously I misspoke and I meant without prejudice.

 3                  THE COURT:  I understood that.

 4                  Okay.  Very nicely briefed, very interesting

 5      issues and beautifully argued, so thank you very much.  The

 6      Court will take the matters under advisement.  Thank you.

 7                  MR. DAVIS:  Thank you, Your Honor.

 8                  MR. KELLY:  Thank you, Your Honor.

 9                  MS. SARFF:  Thank you, Your Honor.

10                  (Court adjourned at 11:36 a.m.)

11                              *      *      *

12

13

14              I, Carla R. Bebault, certify that the foregoing is

15      a correct transcript from the record of proceedings in the

16      above-entitled matter.

17

18

19              Certified by:  s/Carla R. Bebault
                               Carla Bebault, RMR, CRR, FCRR
20

21

22

23

24

25